OPINION *Page 2 
{¶ 1} Plaintiff-appellant, Neal Hamad, and defendant-appellee, Ikram Hamad, were married in Jerusalem on September 17, 1971, and had four children during the marriage, all of whom are emancipated. On July 30, 2004, plaintiff filed a complaint for divorce in the Franklin County Court of Common Pleas, Division of Domestic Relations. Defendant filed an answer and counterclaim for divorce on October 13, 2004. Upon the parties' separate motions, the trial court issued restraining orders enjoining the parties from, as relevant here, transferring marital real estate and/or withdrawing marital funds from bank accounts.
 {¶ 2} Defendant was later granted leave to add the parties' son, Waiel N. Hamad, plaintiff's father, Mahmoud L. Hamad, and plaintiff's sister, Siham Bahour, as party-defendants. Defendant filed a cross-claim asserting that Waiel held legal title to the parties' marital home located in Westerville, Ohio, in constructive trust for the parties and requesting that the court order him to convey the property to the parties. Defendant filed a separate cross-claim against Mahmoud and Siham, asserting that they were the legal owners of certain marital real estate situated in Lake County, Florida, pursuant to a fraudulent conveyance by plaintiff. Defendant requested the court order Mahmoud and Siham to convey legal title to the property to the parties or appoint a receiver to effectuate said transfer.
 {¶ 3} Trial commenced on January 17, 2006. That same day, plaintiff voluntarily dismissed his complaint pursuant to Civ. R. 41(A)(1). Trial continued on February 14, 15, and 16, 2006. Plaintiff did not attend the trial. On May 1, 2006, the trial court filed a judgment entry/decree of divorce. The trial court dismissed Waiel from the action, *Page 3 
granted defendant a divorce, divided the marital property, awarded defendant her separate property, ordered plaintiff to pay defendant spousal support of $100 per year, and ordered plaintiff to pay all of defendant's attorney fees.
 {¶ 4} Plaintiff timely appeals, assigning eight errors:
 1. The trial court erred in overruling appellant's motion to continue the contempt enforcement hearing.
 2. The trial court abused its discretion in denying counsel's request to set aside the capias.
 3. The trial court's finding that appellant stole appellee's entire set of jewelry was against the manifest weight of the evidence.
 4. The trial court's finding that appellant removed appellee's truck and secreted it from her was against the manifest weight of the evidence.
 5. The trial court erred in finding that the jewelry was separate property.
 6. The trial court abused its discretion in awarding appellee her entire attorney fees.
 7. The trial court erred by not making written findings of fact to support the determination that the marital property was equitably divided.
 8. The trial court erred by not properly apportioning the marital debt between the parties.
 {¶ 5} Plaintiff's first and second assignments of error are interrelated and will be addressed jointly. Together they assert the trial court abused its discretion in overruling plaintiff's motion to continue the contempt enforcement hearing and in denying counsel's request to set aside the capias. *Page 4 
 {¶ 6} On January 20 and May 25, 2005, respectively, defendant filed motions requesting the trial court find plaintiff in contempt for violating the restraining order against him by: (1) withdrawing all the funds in the parties' certificate of deposit ("CD") at the Bank of Montreal, and (2) transferring Lake County, Florida property to Mahmoud and Siham. Via judgment entries filed the same day, the trial court ordered plaintiff to appear at a hearing and show cause why he should not be punished for the contempts.
 {¶ 7} At the June 9, 2005 hearing, plaintiff admitted that on October 29, 2004, he closed the parties' Bank of Montreal CD, valued at $41,614.04, and on April 19, 2005, transferred the Lake County, Florida property to his father and sister in violation of the restraining order. Defendant testified and presented documentary evidence that she incurred $3,852.50 in attorney fees and expenses related to the contempt motions.
 {¶ 8} On June 23, 2005, the trial court filed a judgment entry sustaining defendant's contempt motions. Specifically, the court found plaintiff in contempt for violating the restraining order; the court also noted that defendant had incurred attorney fees and expenses in prosecuting the contempt motions. The trial court sentenced plaintiff to a 30-day jail term, suspended upon condition that he, within 30 days of the hearing, purge his contempt by: (1) paying defendant's attorney fees and expenses of $3,852.50; (2) depositing $41,614.04 in trust with his attorney; and (3) exercising full and due diligence to obtain conveyance of the Lake County, Florida property back to him from his father and sister.
 {¶ 9} On July 13, 2005, defendant filed a motion to enforce the contempt sentence on grounds that plaintiff wholly failed to comply with the court's purge order. A hearing was scheduled for August 24, 2005. On July 28, 2005, plaintiff moved for a *Page 5 
continuance on grounds that his counsel was scheduled for a trial in another case on August 24, 2005. The court granted the motion and continued the hearing until October 5, 2005.
 {¶ 10} On August 25, 2005, the court, sua sponte, reset the October 5, 2005 hearing for September 2, 2005 for the following reason: "Court Not Available — [Plaintiff's] Atty Date Was Not Cleared With" [sic]. (Aug. 25, 2005 Motion for Continuance.)
 {¶ 11} On August 29, 2005, plaintiff filed a motion to continue the September 2, 2005 hearing. In the memorandum in support, plaintiff's counsel explained that plaintiff had informed him that he would be out of the country from August 23, 2005 until late September 2005; when counsel was notified of the September 2, 2005 hearing date, he attempted, unsuccessfully, to contact plaintiff and inform him of the change. Counsel asserted plaintiff had no knowledge of the September 2, 2005 hearing and counsel had no means of contacting him. Counsel urged the court to reschedule the hearing so that plaintiff would have the opportunity to be heard prior to enforcement of the contempt sentence. Defendant did not file a response.
 {¶ 12} Without ruling on plaintiff's motion for continuance, the court proceeded with the September 2, 2005 hearing. The record does not include a transcript of that hearing. Following the hearing, the court, finding that plaintiff failed to appear, issued a capias for his arrest.
 {¶ 13} On October 25, 2005, the court filed a judgment entry sustaining defendant's motion to enforce the contempt sentence. The court noted that plaintiff was served through counsel with notice of the hearing, that the sentence previously imposed upon plaintiff was suspended providing plaintiff purged his contempt, and that plaintiff had *Page 6 
failed to purge his contempt. Accordingly, the court ordered plaintiff to serve a jail term commencing upon his coming into the custody of the Franklin County Sheriff and continuing for a period of 30 consecutive days or until he purged himself of contempt by fully and completely complying with the purge order, whichever occurred first.
 {¶ 14} On November 1, 2005, plaintiff filed a motion pursuant to Civ. R. 52 requesting the court enter findings of fact and conclusions of law regarding its October 25, 2005 judgment; plaintiff also submitted proposed findings of fact and conclusions of law. The proposed findings of fact asserted that defendant, her counsel, and plaintiff's counsel appeared at the September 2, 2005 hearing, that plaintiff did not appear, that defendant's counsel argued that the contempt should be enforced, that plaintiff's counsel argued that the hearing should be continued to allow plaintiff to attend, and that no evidence, documentary or testimonial, was presented to the court. The proposed conclusions of law asserted that the trial court determined that the motion to enforce be granted. The trial court never ruled on plaintiff's request for findings of fact and conclusions of law.
 {¶ 15} As noted, trial on defendant's counterclaim and cross-claims was held over four days in January and February 2006. Plaintiff did not attend the proceedings; however, counsel appeared on his behalf. During his testimony on February 14, 2006, Mahmoud explained that plaintiff was currently in Florida and was thus available to attend the trial; Mahmoud further asserted, however, that plaintiff was aware that he was subject to a 30-day jail sentence pursuant to the capias issued against him on September 2, 2005 and was afraid to appear at trial for fear of being jailed.
 {¶ 16} On the final day of trial, during a discussion between counsel and the trial court, plaintiff's counsel reiterated that plaintiff was absent from the trial because he was *Page 7 
subject to a 30-day jail sentence upon appearing in Franklin County. Both defense counsel and the court noted that plaintiff had never requested that the court set aside the capias so that he could appear for trial. The subject of plaintiff's absence was again raised in an exchange between counsel and the court relating to the authenticity of certain documents associated with the withdrawn CD. Plaintiff's counsel requested that the court set aside the capias and bring plaintiff in to testify about the transaction. The court denied the request, stating that it was "[t]oo late for that" and that plaintiff "didn't show up [for trial] on his own accord." (Tr. Vol. II, 370.)
 {¶ 17} As noted, plaintiff maintains the trial court abused its discretion in overruling his motion to continue the contempt enforcement hearing and in denying counsel's request to set aside the capias. Defendant counters that plaintiff's attempted appeal of the trial court's determinations relating to the contempt proceedings is time-barred by App. R. 4(A). In particular, defendant contends the trial court's October 25, 2005 judgment entry sustaining defendant's motion to enforce the contempt sentence constitutes a final appealable order from which plaintiff should have appealed any issues related to the contempt proceedings. Plaintiff responds that the October 25, 2005 entry does not constitute a final appealable order because the trial court failed to rule on his request for findings of fact and conclusions of law.
 {¶ 18} We note initially that the trial court's October 25, 2005 judgment entry sustaining defendant's motion to enforce the contempt sentence is a final appealable order. "[I]t is well-settled that a finding of contempt which imposes a sanction or penalty, such as a jail sentence in the instant action, is a final order from which appeal can be heard." Roberts v. Roberts (July 20, 1995), Franklin App. No. 95APF01-33. See, also, In *Page 8 re Kepperling, Montgomery App. No. 20539, 2006-Ohio-1856, at ¶ 14
(appellate court lacked jurisdiction to review the assigned error where appellant failed to file a notice of appeal from a contempt finding and jail sentence within 30 days after entry); McCree v. McCree, Mahoning App. No. 01 CA 228, 2003-Ohio-1600, at ¶ 21 (appellant waived right to appeal by not filing a timely appeal of the contempt finding and jail sentence). Here, the trial court ordered plaintiff to serve a 30-day jail term for failing to purge his contempts. Accordingly, we find that the October 25, 2005 enforcement judgment constitutes a final appealable order. We will next address whether the trial court's failure to rule on his request for findings of fact and conclusions of law negates the finality of the October 25, 2005 judgment.
 {¶ 19} As a general rule, "when a properly filed request for findings of fact and conclusions of law is filed, no final appealable order exists until the court complies with Civ. R. 52, i.e., issues findings of fact and conclusions of law." Savage v. Cody-Zeigler, Inc., Athens App. No. 06CA5, 2006-Ohio-2760, at ¶ 13, citing First Natl. Bank v.Netherton, Pike App. No. 04CA731, 2004-Ohio-7284, at ¶ 8. See, also, App. R. 4(B)(2) ("In a civil case * * * if a party files a timely motion for * * * findings of fact and conclusions of law under Civ. R. 52, the time for filing a notice of appeal begins to run as to all parties when the order disposing of the motion is entered").
 {¶ 20} Civ. R. 52 provides, in pertinent part:
 When questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing request otherwise before the entry of judgment pursuant to Civ. R. 58, or not later than seven days after the party filing the request has been given notice of the court's announcement of its decision, whichever is later, in *Page 9 
which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law.
 * * *
 Findings of fact and conclusions of law required by this rule and by Rule 41(B)(2) are unnecessary upon all other motions including those pursuant to Rule 12, Rule 55 and Rule 56.
 {¶ 21} Plaintiff filed his request for findings and fact and conclusions of law within seven days after the trial court filed its October 25, 2005 judgment entry. Accordingly, the request was timely under Civ. R. 52.
 {¶ 22} However, "when Civ. R. 52 does not require the court to issue findings of fact and conclusions of law, the court has no duty to issue them and the time for filing a notice of appeal is not tolled."Savage, supra, at ¶ 14. "Although Civ. R. 52 mandates that issuance of findings of fact and conclusions [of law] when questions of fact are tried by the court without a jury, the rule specifically holds that such findings are `unnecessary upon all other motions.'" Id. Accordingly, the issue resolves to whether Civ. R. 52 requires a trial court to issue findings of fact and conclusions of law when requested upon a motion to enforce a contempt sentence.
 {¶ 23} The Supreme Court of Ohio has held that Civ. R. 52 does not require the trial court to issue findings of fact and conclusions of law in contempt proceedings. See State ex rel. Ventrone v. Birkel (1981), 65 Ohio St.2d 10, 12. See, also, Jackson Twp. v. Stickles (Mar. 21, 1996), Franklin App. No. 95APC09-1264; McCord v. McCord (Dec. 16, 1997), Franklin App. No. 97APF03-298. Since Civ. R. 52 does not obligate the trial court to issue findings of fact and conclusions of law, the time for filing a notice of appeal is not tolled. Accordingly, plaintiff has waived his right to appeal any alleged errors related to *Page 10 
the contempt proceedings, including issues related to the capias, by failing to file a timely appeal from the order enforcing the contempt sentence issued on October 25, 2005. App. R. 4(A); McCree, supra.
 {¶ 24} Moreover, the trial court's refusal to lift the capias was well within its discretion. The capias was issued on September 2, 2005; in the three and one-half months preceding trial, plaintiff did not file a written motion requesting that the court set aside the capias so that he could attend the trial. Instead, plaintiff's counsel waited until the final day of trial to assert his oral motion. Plaintiff urges that lifting the capias would not have prejudiced defendant. We disagree. Such action most certainly would have caused further delay in the proceedings, which were already in their final stages. Allowing plaintiff to further delay the proceedings would frustrate the orderly and efficient administration of justice. As the trial court noted in its judgment entry/decree of divorce, plaintiff had failed to appear at earlier hearings, had not previously requested that the capias be lifted, was fully advised that the case was going forward, and was in communication with both his father and sister during the trial. The trial court concluded, based upon plaintiff's past conduct, that plaintiff "had no intention of ever showing up for his divorce proceedings." (May 1, 2006 Judgment Entry/Decree of Divorce, at 1 [emphasis sic]). Under the circumstances, we cannot find that the trial court abused its discretion in denying counsel's oral request to lift the capias. The first and second assignments of error are overruled.
 {¶ 25} Plaintiff's remaining assignments of error generally contend the trial court erred in failing to divide the marital assets and liabilities equally; we will address plaintiff's specific arguments in turn. Resolution of these issues requires a rather extensive *Page 11 
recitation of the evidence adduced at trial as well as a thorough review of the trial court's judgment entry/decree of divorce.
 {¶ 26} As noted, plaintiff and defendant were married in Jerusalem in 1971. From the onset of their marriage, the two made their home in the United States. In 1996, the couple purchased a home in Westerville, Ohio; by 1999, they had paid the mortgage down to $50,000. At some point, the parties conveyed title to the property to their son, Waiel. In March 1998, without defendant's knowledge or permission, plaintiff obtained a $189,000 line of credit from Bank One utilizing the home as collateral. According to defendant, plaintiff took all of the proceeds of the line of credit; she does not know what plaintiff did with the funds.
 {¶ 27} At the time of trial, Bank One had initiated foreclosure proceedings on the Westerville home due to plaintiff's failure to make payments on the line of credit. Two weeks before trial, Waiel conveyed title to the property to defendant. Defendant opined that the home was presently worth $250,000. Even with the line of credit owed, $61,000 in equity exists on the home.
 {¶ 28} During the course of the marriage, plaintiff and defendant owned and operated several businesses, including a furniture store known as Europa Fine Furnishings ("Europa"). Although defendant co-owned and worked at Europa, she was not privy to its financial workings, as plaintiff kept all of Europa's business records in the trunk of his car and withheld them from defendant. On November 12, 2004, pursuant to an agreed release from the restraining order, the couple entered into an agreement whereby plaintiff agreed to sell his one-half interest in the store to defendant for $95,000. Defendant made a down payment of $64,500 and agreed to pay the remaining balance of *Page 12 
$30,000 no later than February 28, 2005. In January 2005, defendant discovered that between November 2004 and January 2005, plaintiff deposited $38,000 in credit-card purchase payments into his personal bank account rather than to Europa's bank account. Defendant instructed her former attorney to notify plaintiff that $30,000 should be credited to the balance she owed plaintiff on the purchase agreement and that he owed defendant $8,000. Defendant testified that she does not know what happened to the funds plaintiff misdirected into his account.
 {¶ 29} Saied Hamad, another son of the parties, lived with defendant until April 2005 and worked with her at Europa. Saied testified that shortly after defendant bought the business, he parked a delivery truck in front of the warehouse and exited the vehicle with the keys still in the ignition. When he returned, the keys were missing; the following day, the truck was gone. Saied opined that plaintiff stole the truck out of spite. He further testified that the truck was worth approximately $12,000 to $14,000. Saied further testified that shortly after selling the business to defendant, plaintiff closed the existing accounts Europa had with its furniture manufacturers/suppliers. Defendant was forced to open new accounts, which caused significant delays in customer shipments; as a result, many customers requested refunds, which, in turn, resulted in Europa losing a substantial amount of business.
 {¶ 30} Defendant testified she owned a considerable amount of jewelry worth approximately $50,000. Defendant averred that she acquired some of the jewelry with money she received as part of her wedding dowry. When she visited Palestine, she often bought jewelry; she sometimes received jewelry as gifts from her father and brothers. In addition, she and plaintiff often purchased small pieces of jewelry from a man in Warren, *Page 13 
Ohio. Between 1978 and 1980, she purchased three diamond rings from her son's store on a trade-in basis; she and plaintiff were to pay the difference.
 {¶ 31} Defendant testified that she last saw her jewelry in a safety-deposit box plaintiff opened in the name of the parties' cellular phone/pager company. According to defendant, plaintiff had both keys to the safety-deposit box; accordingly, she could not access it. In January 2004, defendant asked plaintiff to retrieve some of the jewelry so she could wear it to a wedding. Plaintiff refused, averring that he took all the jewelry because it was his investment.
 {¶ 32} According to Saied, defendant owned at least 15 gold bracelets, one or two gold necklaces, and one diamond ring. Saied averred that defendant had owned the jewelry "for a long time" and that "I remember from when we lived in Warren mostly." (Tr. Vol. I, 149.) He further testified that "as far as [he] knew," defendant still had the jewelry when he moved out in April 2005. Id.
 {¶ 33} During the marriage, the parties deposited approximately $41,000 into a CD at the Bank of Montreal. On October 29, 2004, plaintiff withdrew the entire balance of the CD, $41,604.14, without defendant's knowledge or permission. This withdrawal was the subject of the contempt proceeding against plaintiff, and as noted, the trial court ordered him to repay those funds. As of the time of trial, plaintiff had not reimbursed any of the withdrawn funds.
 {¶ 34} In August 2001, the couple jointly purchased Still Waters Mobile Home Park ("Still Waters") in Lake County, Florida from The Charles R. Stewart and Eleanor A. Stewart Family Trust ("The Stewart Family Trust"). The Stewart Family Trust held an $800,000 mortgage on the property. In August 2004, without defendant's knowledge or *Page 14 
permission, plaintiff entered into a purchase agreement to sell Still Waters to a Florida corporation, Crest Investment Property, Inc. ("Crest") for $1.6 million. Crest deposited $10,000 with plaintiff.
 {¶ 35} At some point, plaintiff fell behind on the mortgage payments, and The Stewart Family Trust threatened him with foreclosure. Plaintiff told Mahmoud and Siham he needed money to forestall the foreclosure; however, he did not tell them that he had filed for divorce or was subject to a restraining order. Mahmoud and Siham discussed the matter and agreed to help; however, they could only provide a total of $350,000. On April 19, 2005, without defendant's knowledge or permission, plaintiff transferred the property by warranty deed to Mahmoud and Siham. In exchange, Mahmoud paid $250,000 and Siham paid $100,000 on the mortgage. Because these payments were made in cash, The Stewart Family Trust forgave $100,000 of the mortgage; thus, $350,000 remained on the mortgage. Mahmoud and Siham assumed the mortgage and agreed to make monthly payments of $3,146. As part of the transaction, plaintiff agreed to manage the property at no salary; Mahmoud promised plaintiff he would be compensated at a later date if the property became profitable.
 {¶ 36} Mahmoud testified that he and defendant never spoke to one another in the 34 years defendant and plaintiff were married. Although he rarely spoke to plaintiff, he agreed to help him with Still Waters because he was family. Mahmoud obtained the $250,000 he used to purchase Still Waters through the sale of land he owned in Palestine. More specifically, Mahmoud averred he was paid $334,000 in cash for the sale of his land and transported it to the United States in a suitcase. Although Mahmoud *Page 15 
averred that he had documentation to substantiate his receipt of the $334,000, he did not produce it in court.
 {¶ 37} Once he made the decision to help plaintiff, Mahmoud retrieved $250,000 from his home safe, put it in a briefcase, and placed it in the trunk of his car. He and plaintiff then drove from Ohio to Florida. Mahmoud stayed with plaintiff in one of the Still Waters units and hid the money in a heating duct overnight. The next day, Mahmoud and Siham met with plaintiff and the trustees of the The Stewart Family Trust and consummated the transfer.
 {¶ 38} Siham testified that due to family problems, she had not spoken to defendant since 1982; in addition, she had no communication with plaintiff from 1982 to 2000. However, like her father, she agreed to help plaintiff. Siham testified that she netted $122,000 from the June 2004 sale of a home in Pennsylvania and withdrew $100,000 cash from her bank account. However, she did not produce a receipt from The Stewart Family Trust to substantiate the Still Waters transaction, nor did she present a bank statement demonstrating a $100,000 cash withdrawal. According to Siham, plaintiff wrote to her in June 2005 and asked her to convey the property back to him because he had recently learned the transfer was in derogation of the restraining order against him; she refused the request.
 {¶ 39} The Still Waters transfer was the subject of the contempt proceeding against plaintiff; the court ordered him to obtain a conveyance of the deed back from his family members. As of the trial date, plaintiff had yet to obtain such conveyance.
 {¶ 40} Notwithstanding his acceptance of the $10,000 check, plaintiff refused to consummate the sale to Crest. As a result, Crest filed a lis pendens action against the *Page 16 
property as well as claims against plaintiff, Mahmoud and Siham for specific performance and fraudulent conveyance; Crest also filed a tortious interference action against Mahmoud and Siham. Mahmoud and Siham failed to make the mortgage payments on Still Waters; accordingly, in November 2005, The Stewart Family Trust filed an action for foreclosure and fraud against plaintiff, Mahmoud and Siham. All these legal actions remained pending at the time of trial.
 {¶ 41} During the pendency of the divorce proceedings in this country, plaintiff obtained a valid Islamic divorce from the Religious Court in Ramallah and thereafter married a Palestinian woman in the West Bank. Defendant testified that plaintiff spent $26,000 of marital funds on jewelry for his new wife's dowry. To substantiate her claim, defendant averred that her Israeli brother sent her a receipt from a West Bank Jewelry store; however, she did not produce the receipt. The marriage certificate (defendant's Exhibit J), indicates that at the time of the marriage, plaintiff owed a dowry of 5,000 Jordania Dinars.
 {¶ 42} Defendant testified that during the marriage, plaintiff's aunt gave the couple a gift of land in Al Berih worth approximately $200,000. She also testified that plaintiff owned a life insurance policy with a cash value of $3,920.
 {¶ 43} Based upon the foregoing evidence, the trial court issued a judgment entry/decree of divorce. The court determined the duration of the marriage to be from September 17, 1971 until January 17, 2006, or 34 years and four months.
 {¶ 44} As to the real property, the court ordered plaintiff to pay and hold defendant harmless from the line of credit on the marital home payable to Bank One up to the amount of $189,000. The court further ordered plaintiff to reimburse defendant for any *Page 17 
monies she paid toward that obligation from his share of the proceeds from the sale of Still Waters. The court awarded the marital home to defendant; however, the court ordered that plaintiff receive $30,500 as his one-half of the equity in the home. The court equally divided the parties' Al-Berih real estate interests.
 {¶ 45} The court ordered plaintiff to pay and hold defendant harmless from any obligations, including the mortgage to The Stewart Family Trust, secured by or associated with Still Waters, including all costs of litigation associated therewith. The court determined that the transfer of Still Waters was fraudulent as to defendant; accordingly, the court declared Mahmoud and Siham constructive trustees of the title to Still Waters for the benefit of plaintiff and defendant. The court ordered Mahmoud and Siham to convey all right, title, and interest in Still Waters to defendant within 30 days of the filing of the judgment entry; upon any failure to comply with the order, defendant would be afforded all rights under Civ. R. 70 to accomplish the conveyance.
 {¶ 46} The court further ordered that upon any sale or other disposition of Still Waters, and upon satisfaction of any enforceable claims for real estate commissions and the payment of any obligations secured thereby, the net proceeds of the sale must be divided equally between plaintiff and defendant. The court further ordered that any obligations imposed upon plaintiff which have not been satisfied by him at the time of the closing of the sale or disposition must be paid to defendant from plaintiff's portion of net proceeds, with plaintiff entitled to any offsets for the equity in the marital home.
 {¶ 47} The court awarded Europa to defendant as her separate property. The court determined that the delivery truck was part of the sale of Europa and that plaintiff removed it and secreted it from defendant. The court determined that the truck had a *Page 18 
reasonable market value of $14,000 and ordered plaintiff to pay defendant that amount within 30 days of the date of the judgment.
 {¶ 48} The court determined that all of defendant's jewelry was her separate property and that plaintiff took the jewelry from the safety-deposit box. The court determined that the jewelry was worth $50,000 and ordered plaintiff to pay that amount within 12 months of the date of the judgment, or upon the sale of Still Waters, whichever occurred first.
 {¶ 49} The court found that plaintiff withdrew $41,604.04 from the Bank of Montreal CD in violation of the restraining order, that plaintiff was found in contempt for that action, and that he had refused to purge the contempt as ordered by the court. Accordingly, the court ordered plaintiff to pay defendant her one-half interest in those funds, or $20,807.02, within 12 months of the date of the judgment or upon the sale of Still Waters, whichever occurred first.
 {¶ 50} The trial court awarded the life insurance policy to defendant. The court determined the policy had a cash value of $3,920 and that plaintiff and defendant were each entitled to a one-half interest in that policy, or $1,960.
 {¶ 51} The court determined that plaintiff married another woman while he was still legally married to defendant and that he had promised to pay 5,000 Jordanian Dinars as a dowry for his new wife. The court took judicial notice that the exchange rate for the Jordanian Dinar was $1.41 in U.S. currency as of the time of the marriage. The court valued the dowry at $7,050 and ordered plaintiff to immediately pay defendant one-half of that amount, or $3,525, as her portion of the marital funds spent. *Page 19 
 {¶ 52} The court ordered plaintiff to pay defendant spousal support of $100 per year. The court also ordered plaintiff to pay all of defendant's attorney fees, or $18,736, within 30 days of the judgment.
 {¶ 53} As noted, plaintiff challenges various aspects of the trial court's property division. Pursuant to R.C. 3105.171(B), a domestic relations court must determine what constitutes marital property and what constitutes separate property; it then must divide the marital and separate property equitably between the spouses in accordance with R.C. 3105.171. The court generally disburses a spouse's separate property to that spouse. R.C. 3105.171(D). Pursuant to R.C. 3105.171(C)(1), the court must divide the marital property equally unless an equal division would be inequitable; in dividing marital property, the court must consider all relevant factors, including those set forth in R.C. 3105.171(F). In addition, the trial court must make written findings of fact to support its determination that the marital property has been equitably divided and must "specify the dates it used in determining the meaning of `during the marriage.'" R.C. 3105.171(G).
 {¶ 54} A domestic relations court enjoys broad discretion in fashioning a division of marital property, and its decision will not be reversed absent an abuse of that discretion. Kaechele v. Kaechele
(1988), 35 Ohio St.3d 93, 95. The term "abuse of discretion" connotes more than an error of law or judgment; rather, it implies that the court's attitude was unreasonable, arbitrary or capricious.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. A reviewing court may not substitute its judgment for that of the trial court unless, considering the totality of the circumstances, the trial court abused its discretion. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 131. A court should not review discrete aspects of a property division out of the context of the entire award. Baker v. Baker *Page 20 
(1992), 83 Ohio App.3d 700, 702. Rather, a court should consider whether the trial court's disposition of marital property as a whole resulted in a property division which was an abuse of discretion. Id.
 {¶ 55} Plaintiff's third and fifth assignments of error challenge the trial court's disposition as to the jewelry and, as such, will be considered together. Plaintiff contends the trial court's findings that all the jewelry was defendant's separate property and that plaintiff stole the jewelry are against the manifest weight of the evidence.
 {¶ 56} A trial court's classification of property as either marital or separate involves a factual inquiry under the manifest weight of the evidence standard. Hemming v. Hemming, Franklin App. No. 02AP-94, 2002-Ohio-4735, at ¶ 18. Under such standard, the trial court's judgment will not be reversed as being against the manifest weight of the evidence if the court's decision is supported by competent, credible evidence. Id.
 {¶ 57} Generally, marital property includes all real and personal property or an interest in such property owned by one or both of the spouses and "acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i) and (ii). In contrast, separate property is excluded from the definition of marital property. R.C. 3105.181(A)(3)(b). Included in the ambit of "separate property" is any real or personal property or an interest in such property "acquired by one spouse prior to the date of the marriage," R.C. 3105.171(A)(6)(ii), and any gift of real or personal property or an interest in such property "made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(vii).
 {¶ 58} With these concepts in mind, we turn to the instant matter. Plaintiff contends the trial court improperly concluded that all the jewelry was separate property; *Page 21 
plaintiff asserts he and defendant purchased at least some of it with marital funds during the marriage. Defendant counters that all the jewelry was her separate property because it was either owned prior to the marriage (the dowry) or was given to her as gifts.
 {¶ 59} The evidence establishes that at least part of the jewelry was purchased with marital funds. As noted, defendant testified that in addition to the jewelry she purchased with her dowry and/or received as gifts, both she and plaintiff purchased jewelry during the marriage. At least a portion of the jewelry was marital property, as it was acquired by one or both of the spouses during the marriage. See R.C. 3105.171(A)(3)(a)(i). Accordingly, the trial court erred in characterizing all the jewelry as separate property.
 {¶ 60} However, in Hemming, supra, this court stated that "[a] trial court's error in improperly categorizing separate property as marital property must be prejudicial in light of the total circumstances." Id. at ¶ 21. We see no reason why this premise should not apply to a trial court's mischaracterization of marital property as separate property. Accordingly, we must now determine whether the trial court's mischaracterization of a portion of the jewelry as separate property rather than marital property was harmless error.
 {¶ 61} Here, the trial court found that plaintiff took all the jewelry from the safety-deposit box. R.C. 3105.171(E)(3) provides that "if a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." The burden of proving financial misconduct is on the complaining spouse.Mantle v. Sterry, Franklin App. *Page 22 
No. 02AP-286, 2003-Ohio-6058, at ¶ 31, citing Jacobs v. Jacobs, Scioto App. No. 02CA2846, 2003-Ohio-3466, at ¶ 25. The trial court has discretion in determining whether a spouse committed financial misconduct, subject to a review of whether its determination was against the manifest weight of the evidence. Id., citing Babka v. Babka (1992), 83 Ohio App.3d 428, andSwartz v. Swartz (1996), 110 Ohio App.3d 218.
 {¶ 62} Financial misconduct arises in circumstances where one spouse engages in some type of knowing wrongdoing and involves some form of profit or interference with another's property rights. Mantle, supra. As examples, "[t]his court has affirmed findings of financial misconduct in cases where a party has violated the court's restraining orders, dissipated marital assets without the knowledge or permission of the other party, stole equipment, inventory and records of the party's business so as to interfere with the continued operation of the business, cashed an insurance check and used all of the money for the party's own purposes, and sold stock owned by the other party, without the other party's knowledge or permission." Id. at ¶ 33. (Citations omitted).
 {¶ 63} Accordingly, pursuant to R.C. 3105.171(E)(3) and the case law construing it, if the evidence supports the trial court's finding that plaintiff engaged in financial misconduct by taking the jewelry from the safety-deposit box, the court could compensate defendant with the value of the portion of the jewelry that was marital property, in addition to an award of the value of the portion of the jewelry that was separate property.
 {¶ 64} Plaintiff contends the trial court's finding that he took the jewelry was against the manifest weight of the evidence. In ordering plaintiff to pay defendant the $50,000 value of the jewelry, the trial court relied upon defendant's testimony that plaintiff had both keys to the safety-deposit box and told her, in January 2004, that he removed *Page 23 
the jewelry from the safety-deposit box because it was his investment. Plaintiff contends the trial court ignored evidence to the contrary; that is, Saied's testimony that he saw defendant with jewelry in 2005.
 {¶ 65} Contrary to plaintiff's assertion, the trial court's judgment entry/decree of divorce does not suggest that the court "ignored" Saied's testimony. The court found that no credible evidence contradicted defendant's testimony; it did not find that defendant's testimony was completely uncontradicted. In addition, the court stated that "the omission of a fact from this Decree does not suggest that the Court did not consider that fact." (Judgment Entry/Decree of Divorce, at 15.)
 {¶ 66} Further, it is well-settled that the weight of the evidence and the credibility of the witnesses are issues left to the sound discretion of the trial court. White v. White, Gallia App. No. 03CA11,2003-Ohio-6316, at ¶ 15. The underlying rationale is that the trier of fact is better situated than an appellate court to view the witnesses and to observe their demeanor, gestures, and voice inflictions and to use those observations to weigh and assess credibility. Id. (Citations omitted.) Accordingly, the trier of fact is free to believe all, part, or none of the testimony of any witness who appears before it. Id. (Citations omitted.)
 {¶ 67} The trial court's finding that no credible evidence contradicted defendant's testimony suggests that the trial court assigned little, if any, weight to Saied's testimony; such is the province of the trier of fact. Id. Further, contrary to plaintiff's assertion, Saied's testimony does not definitively establish that defendant had the jewelry in 2005. Rather, Saied testified only that defendant had owned the jewelry "for a long time," and that he remembered it from when the family lived in Warren (where the parties lived *Page 24 
immediately prior to moving to Westerville in 1996). Although he testified that he had seen the jewelry in his mother's home, he did not specify when he had seen it. In addition, he testified only that "as far as [he] knew," defendant still had the jewelry when he moved out of defendant's home in April 2005.
 {¶ 68} Having determined that the evidence supports the trial court's finding that plaintiff engaged in financial misconduct by taking the jewelry from the safety-deposit box, the court could compensate defendant with the value of the portion of the jewelry that was marital property. Accordingly, plaintiff's third and fifth assignments of error are overruled.
 {¶ 69} Plaintiff's fourth assignment of error contends the trial court's finding that defendant stole the Europa delivery truck is against the manifest weight of the evidence. As noted by plaintiff, Saied provided the only testimony regarding the truck. He averred only that he parked the truck by the warehouse and left the motor running. When he returned, the keys were missing. The next day, the truck was gone. Although Saied stated that plaintiff had taken the keys, no further testimony substantiated that claim. Saied never testified that he saw plaintiff in the vicinity of the warehouse or that he saw plaintiff with the keys or the truck.
 {¶ 70} Saied's conclusion that plaintiff stole the truck out of spite is clearly speculative. Saied left the truck's motor running while he went inside the warehouse. Anyone walking along the street could have taken it. No evidence established that defendant or Saied contacted plaintiff after the truck disappeared or ever discovered what happened to the truck. In short, there is no competent, credible evidence linking plaintiff to the truck's disappearance. Accordingly, the trial court abused its discretion in finding *Page 25 
that defendant stole the truck and in ordering to pay defendant $14,000 for the value of the truck. The fourth assignment of error is sustained.
 {¶ 71} Plaintiff's sixth assignment of error contends the trial court abused its discretion in awarding defendant all her attorney fees. R.C. 3105.73(A) governs the award of attorney fees and litigation expenses in domestic relations cases and provides: "a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." In assessing whether an award is equitable "the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." Id. A trial court's decision to award attorney fees in a divorce action is subject to an abuse of discretion standard. Ockunzzi v.Ockunzzi, Cuyahoga App. No. 86785, 2006-Ohio-5741, at f70. A party is not entitled to attorney fees; rather, the court may decide on a case-by-case basis whether an award of attorney fees would be equitable. Id.
 {¶ 72} Following trial, defendant's counsel submitted an affidavit asserting that defendant incurred $18,736 in "reasonable and necessary" legal fees and expenses. The trial court ordered plaintiff to pay that entire amount to defendant. In so ordering, the court stated that "the amount of [defendant's] attorney fees has been substantially impacted by the misconduct of Plaintiff in this case, including his repeated instances of contemptuous conduct and his failure to appear at proceedings[.]" (Judgment Entry/Decree of Divorce, at 15.)
 {¶ 73} Plaintiff contends that the trial court abused its discretion in relying solely upon his misconduct as justification for awarding defendant her entire attorney fees. *Page 26 
Plaintiff further contends the trial court abused its discretion in failing to assess and make specific findings concerning the parties' abilities to pay attorney fees.
 {¶ 74} Initially, we note that plaintiff did not file a memorandum in opposition to defendant's counsel's affidavit. Plaintiff certainly should have anticipated that his misconduct, the findings of contempt against him, and his failure to appear at trial might negatively impact the trial court's award of attorney fees, given that "the conduct of the parties" is one of the factors the trial court may consider in awarding attorney fees; as such, plaintiff could have asserted his "misconduct" argument in the trial court. Likewise, plaintiff could have asserted his "ability to pay" argument in the trial court. Outside of what the trial court learned during proceedings, plaintiff's failure to respond left it with nothing to consider other than defendant's counsel's affidavit.
 {¶ 75} Moreover, contrary to plaintiff's contention, the trial court did not rely solely upon plaintiff's misconduct in awarding attorney fees. The trial court averred only that the amount of defendant's attorney fees was "substantially impacted" by plaintiff's misconduct. Further, the court ordered the award "pursuant to the provisions] of R.C. § 3105.73(A)." The court's reference to the statute suggests that it considered all the factors contained therein, not just plaintiff's misconduct.
 {¶ 76} Finally, as already noted, R.C. 3105.73(A) expressly lists the "the conduct of the parties" as one of the factors the court may consider in determining whether an award of attorney fees is equitable. Conversely, R.C. 3105.73(A) does not specifically list the parties' abilities to pay attorney fees as one of the factors the court may consider. Clearly, the trial court may consider the parties' abilities to pay under the catchall "any other relevant factors the court deems appropriate"; however, the trial court does not *Page 27 
abuse its discretion if it fails to consider the parties' abilities to pay. Accordingly, the trial court did not abuse its discretion in its award of attorney fees to defendant. The sixth assignment of error is overruled.
 {¶ 77} We will address plaintiff's seventh and eighth assignments of error together, as they share common issues and plaintiff asserts some of the same arguments for both assignments of error. Plaintiff argues in his seventh assignment of error that the trial court failed to make written findings of fact in accordance with R.C. 3105.171(G) to support its determination that the marital property was equitably divided. Plaintiff argues in his eighth assignment of error that the trial court did not properly apportion the parties' marital debt. Both of these assignments of error concern the trial court's dispositions as to the line of credit on the marital home and Still Waters.
 {¶ 78} "The facts and circumstances of each case dictate what is an equitable division of marital property." Apps v. Apps, Franklin App. No. 02AP-1072, 2003-Ohio-7154, at ¶ 37. As noted, R.C. 3105.171(C)(1) provides that the trial court must divide marital property equally unless an equal division would be inequitable; in dividing marital property, the court must consider all relevant factors, including the nine set forth in R.C. 3105.171(F). Those factors are: (1) the duration of the marriage, (2) the assets and liabilities of the parties, (3) the desirability of awarding the marital home to the spouse with custody of the children, (4) the liquidity of the property to be distributed, (5) the economic desirability of retaining intact an asset or an interest in an asset, (6) the tax consequences of the property division, (7) the costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property, (8) any division or disbursement of property made in a separation agreement that was voluntarily entered into by the *Page 28 
spouses, and (9) any other factor that the court expressly finds to be relevant and equitable.
 {¶ 79} In addition, the trial court must make written findings of fact to support its determination that the marital property has been equitably divided. R.C. 3105.171(G). The objective of the findings of fact authorized by R.C. 3105.171(G) is to facilitate meaningful appellate review consistent with Civ. R. 52. Hoover v. Hoover (Nov. 1, 1993), Clinton App. No. CA93-03-008. The requirements of R.C. 3105.17(G) are satisfied when the reviewing court is able to ascertain the requisite information from various portions of the record, including the trial court's decision. Id.
 {¶ 80} In this case, the trial court did not file a separate document that purported to constitute its findings of fact; rather, the court incorporated its factual findings into its judgment entry/decree of divorce. The judgment entry/decree of divorce sets forth a detailed recitation of the evidence presented at trial regarding plaintiff's actions as to both the line of credit on the marital home and Still Waters. In addition, the trial court specifically stated that the division of property was equitable if not precisely equal.
 {¶ 81} More specifically, as to the line of credit, the trial court found that plaintiff opened the $189,000 line of credit in March 1998, that plaintiff absconded with the proceeds of the loan, and that defendant had no idea what plaintiff did with the proceeds. Based upon these facts, the trial court ordered plaintiff to pay and hold defendant harmless from the entire line of credit. Plaintiff acknowledges that the trial court's award appears to have been based upon his misconduct in dissipating the funds from the line of credit, but argues that since the marital home was marital property, the parties should *Page 29 
bear the debt equally. Plaintiff contends the trial court did not fully explain how his misconduct made him liable for the entire credit line. We disagree.
 {¶ 82} Oftentimes, the time frame when marital funds are dissipated is a relevant factor in determining an inference of wrongdoing, or misconduct, especially when the dissipation occurs during the parties' separation. Logan v. Logan, Franklin App. No. 03AP-225, 2003-Ohio-6559, at ¶ 22, citing Hammond v. Brown (Sept. 14, 1995), Cuyahoga App. No. 67268. However, as this court has noted, "`every factual scenario is different. We cannot say as a matter of law that the trial court erred in the case at bar by adopting a finding that the unilateral dissipation of marital funds, which occurred during the marriage and prior toseparation, constituted financial misconduct.'" Id., quoting Donato v.Donato (June 26, 1998), Lake App. No. 96-L-224. (Emphasis sic.) This court has held that dissipation of marital assets is a relevant other factor justifying disproportionate awards of marital property.Wilder v. Wilder (Apr. 25, 1989), Franklin App. No. 88AP-685. Further, R.C. 3105.171(C) and (E)(3) provide for disproportionate awards where financial misconduct is supported by the record.
 {¶ 83} Here, the trial court's conclusion that plaintiff engaged in financial misconduct stemming from his unilateral dissipation of funds from the line of credit is fully supported by the record. Although the line of credit on the marital home, having been incurred during the marriage, was technically marital debt, defendant testified that plaintiff absconded with the proceeds. No evidence contradicted that testimony. In addition, defendant testified that the marital home was subject to foreclosure due to plaintiff's failure to pay on the line of credit; as a result, defendant was in the process of negotiating with the bank in an effort to keep the home. Under such circumstances, the trial court *Page 30 
was well within its discretion to shield defendant from any responsibility for the debt. Accordingly, the trial court did not abuse its discretion in ordering plaintiff to pay and hold defendant harmless from the entire line of credit.
 {¶ 84} Regarding Still Waters, the trial court set forth a thorough and detailed recitation of the facts leading to the transfer of that property. Indeed, the court found that plaintiff and defendant owned Still Waters subject to an $800,000 mortgage held by The Stewart Family Trust. Plaintiff, without defendant's knowledge, contracted with Crest to sell Still Waters for $1.6 million; he later reneged on the contract, which resulted in Crest filing a lawsuit. The court further found that plaintiff, again without defendant's knowledge, transferred the property to Mahmoud and Siham in violation of the court's restraining order. The court specifically averred that it disbelieved Mahmoud's and Siham's testimony regarding the origin of the $350,000 they allegedly provided as consideration for the transfer and their alleged assumption of liability for the balance of the mortgage. The court further found that Still Waters is subject to foreclosure as a result of Mahmoud's and Siham's failure to make the monthly mortgage payments.
 {¶ 85} Based upon these and numerous other, more detailed factual findings, the court ordered plaintiff to pay and hold defendant harmless from any obligations on the mortgage, including litigation costs related to the pending lawsuits. In so ordering, the court averred that the history of plaintiff's dealings with Still Waters demonstrated his lack of good faith and attempt to deprive defendant of her interest in Still Waters; indeed, the court surmised that plaintiff may have orchestrated the transfer of Still Waters to Mahmoud and Siham with the specific intent to sell the property and abscond with the proceeds. The court readily acknowledged that the evidence did not clearly establish *Page 31 
whether Mahmoud and Siham were willing accomplices in plaintiff's effort to defraud defendant and/or whether the $350,000 cash originated from plaintiff or was actually provided by Mahmoud and Siham; however, the court ultimately determined that neither Mahmoud nor Siham sufficiently traced their individual cash investments to the court's satisfaction. In addition, the court questioned why Mahmoud and Siham did not simply loan plaintiff the money to pay down the mortgage, which would have obviated the need for the transfer.
 {¶ 86} The court determined that the transfer of Still Waters was fraudulent as to defendant. In so finding, the court noted that at the time of the transfer, Still Waters had a market value of $1.6 million; even assuming the $350,000 payment originated with Mahmoud and Siham and that they assumed liability for the remaining $350,000 mortgage, they instantly acquired equity of $900,000 above what is owed. The court concluded that "this transaction for wholly inadequate consideration, was not bona fides and did not involve a transfer of the land for value." (Judgment Entry/Decree of Divorce, at 11.) Accordingly, as noted above, the court declared Mahmoud and Siham constructive trustees of the title to Still Waters for the benefit of plaintiff and defendant and ordered them to transfer the property to defendant, with the net proceeds of any sale or other disposition of the property to be divided equally between plaintiff and defendant.
 {¶ 87} As with the credit line, plaintiff acknowledges that the trial court's decision to make plaintiff fully responsible for the remaining mortgage on Still Waters appears to have been based upon his misconduct in transferring title to the property to his family members without defendant's knowledge; however, plaintiff contends that since Still Waters was marital property, the parties should bear the debt associated therewith *Page 32 
equally. Plaintiff contends the trial court did not fully explain how his misconduct made him liable for the entire mortgage in sufficient detail to enable this court to determine whether the trial court's disposition was fair, equitable, and according to law. We disagree.
 {¶ 88} This court cannot envision a more comprehensive or thorough recitation of facts regarding plaintiff's actions regarding Still Waters or how the trial court could have more fully explained its disposition of that asset and the debt associated therewith. As noted, R.C. 3105.171(E)(3) and the cases interpreting it permit the trial court discretion to compensate an offended spouse with a greater award of marital property if the offending spouse has engaged in financial misconduct. Here, plaintiff clearly met her burden of proving financial misconduct. The trial court evaluated the evidence and determined that plaintiff fraudulently transferred Still Waters in an effort to deprive defendant of her rights in that property. Plaintiff's contention that the trial court should have divided the Still Waters' mortgage debt equally, despite his misconduct, renders R.C. 3105.171(E)(3) virtually meaningless.
 {¶ 89} Plaintiff also suggests that the trial court failed to consider all of the statutory factors set forth in R.C. 3105.171(F) in its disposition of Still Waters. Specifically, plaintiff contends the trial court did not consider the economic desirability of retaining Still Waters as an asset (R.C. 3105.171[F][5]), the tax consequences of the property division (R.C. 3105.171[F][6]), and the costs of sale (R.C. 3105.171[F][7]). However, this court has held that a reviewing court presumes that the trial court has considered all relevant statutory factors and other pertinent facts when determining the division of marital property. Remali v. Remali (May 10, 1994), Franklin App. No. 93APF08-1202, citing Carpenter v. *Page 33 Carpenter (1988), 61 Ohio App.3d 584; see, also, Hoenie v. Hoenie (Mar. 18, 1993), Franklin App. No. 92AP-1381. Further, this court has also held that a trial court does not need to speculate as to potential factors where an appellant has failed to produce evidence pertaining thereto. Logan, supra, at ¶ 27, citing Syslo v. Syslo, Lucas App. No. L-01-1273, 2002-Ohio-5205, at ¶ 72. In the absence of evidence regarding these factors, the trial court was not required to speculate about them. Instead, the trial court considered the evidence presented and based its disposition upon that evidence. Accordingly, the trial court did not abuse its discretion in ordering plaintiff to pay and hold defendant harmless from the remaining mortgage debt on Still Waters. The seventh and eighth assignments of error are overruled.
 {¶ 90} For the foregoing reasons, plaintiff's fourth assignment of error is sustained and plaintiff's first, second, third, fifth, sixth, seventh and eighth assignments of error are overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part and reversed in part, and the matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part, and cause remanded.
 BROWN and FRENCH, JJ., concur. *Page 1