[Cite as *Evans v. Evans*, 2025-Ohio-1470.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Richard T. Evans,                          :

    Plaintiff-Appellee,             :

                                     No. 23AP-525

v.                                         :         (C.P.C. No. 21DR-3742)

Penny E. Evans,                            :         (REGULAR CALENDAR)

    Defendant-Appellant.            :

---

D E C I S I O N

Rendered on April 24, 2025

---

**On brief:** *Trolinger Law Offices, LLC*, and *Christopher L. Trolinger*, for appellant. **Argued:** *Christopher L. Trolinger*.

**On brief:** *Nielsen Law, LLC*, and *Tiffany C. Miller*, for appellee. **Argued:** *Tiffany C. Miller*.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Penny E. Evans, appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations regarding the trial court's August 10, 2023 decree of divorce from plaintiff-appellee, Richard T. Evans, following a trial held on May 15, 16, and 18, 2023. Penny and Richard were married on April 2, 2013 and have no children born of the marriage.

{¶ 2} Richard filed an amended complaint for divorce on November 4, 2021, alleging incompatibility, gross neglect of duty, and extreme cruelty. Penny filed an answer admitting incompatibility but denying neglect and cruelty on that same date. Her answer also alleged that Richard had engaged in financial misconduct, but she did not file any counterclaims.

{¶ 3}    Richard and Penny were living together in the marital residence at the time of the divorce filing, but he moved out on April 15, 2022.  During the marriage, Penny was employed as a bus driver for Gahanna-Jefferson schools, and Richard was employed by Paine Holdings and served as the safety director of its subsidiary Accurate Transportation ("Accurate"). Richard also owned RT Evans Enterprises, L.L.C. ("RT Evans")—a business entity that contracted with Accurate to operate 14 over-the-road trucks.  RT Evans does not own any trucks, nor does it own any property—the trucks are leased from Accurate, who in turn leased them from another separate entity.  (May 15, 2023 Tr. Vol. I at 46 and 93.) Apparently, RT Evans has a "symbiotic" relationship with Accurate, in that Richard manages the 14 trucks and pays the maintenance and expenses of the independent drivers and trucks, while Accurate manages the customers.  *Id.* at 95-96.  From the record here, it appears that RT Evans' sole function is to provide a channel for Accurate to contract with independent truckers rather than doing so directly.  Apparently, shipping revenues are paid to Accurate and Paine Holdings, rather than RT Evans.  *Id.*  Accurate then pays RT Evans the amounts required for the costs of the contracted drivers as well as for the expenses of the vehicles, and RT Evans in turn pays Accurate approximately $10,500/week for the lease of the trucks.  *Id.* at 49.  Richard testified that the revenues Accurate and Paine Holdings pay to RT Evans are "basically generated to pay the expenses" associated with running RT Evans.  *Id.* at 50.  And as a result, RT Evans is apparently not a profit-making entity, and no money passes from RT Evans to Richard—he testified on cross-examination that "[t]he money that comes from RT Evans Enterprises is pushed back into the company to pay for damages due to the trucks.  I do not write myself a paycheck from RT Evans Enterprises." (May 16, 2023 Tr. Vol. II. at 124.)  He did admit that there were other expenses—in particular a company automobile and a lease—that were alleged by Penny to have been personal to Richard but were paid by RT Evans, based on his tax returns. Richard testified that "[y]ou have to talk to my accountant for that."  *Id.* at 157-160, 183-184.

{¶ 4}    Penny filed a motion to add RT Evans as a party to the case on January 13, 2022, but the trial court ultimately concluded that this motion "was never prosecuted" and "is moot." (Aug. 10, 2023 Jgmt. Entry/Decree of Divorce at 3.) Neither party was awarded spousal support or attorney fees during the temporary orders phase of the case, but Richard

was ordered to pay for the mortgage, taxes, and insurance for the residence during the litigation. Penny was ordered to pay the utilities and maintenance.

{¶ 5} A contested trial was set for May 15, 16, and 18, 2023. Both parties were represented initially, but on February 16, 2023, Penny's counsel withdrew with leave of court. Penny did not contact the trial court until May 15, 2023, the first day scheduled for trial, when she appeared and requested a continuance to obtain new counsel. Richard opposed the continuance. Penny represented to the court that she "assumed" her former counsel would be representing her at trial that day:

> THE COURT: So tell him what you just told us to why he -- you thought [former counsel] should be representing you today.
>
> MS. EVANS: Well, when I received the phone call from him stating that, you know -- well, I called him, because he did send me an email regarding him filing the paperwork to be withdrawn from the case.
>
> So I called him. We had talked on the phone, and he said that, you know, I owed him money, which he never once -- I never got a statement emailed, a statement in the mail. I had seen him face-to-face.
>
> He did not say, Hey, you owe this, that and the other. So when I talked to him on the phone about withdrawing, he said that he had to file the paperwork prior, like, in a timely fashion, it couldn't be in April when I told him I could pay him. He said that it would be too late then, that he had to file the paperwork prior.
>
> And I said, Okay. So what if I pay you the monies owed? He said that he could -- would just pick up the case. And I said, Okay. So when I paid it, I assumed that, you know, he would pick up the case.
>
> So then I got a message from his secretary that they needed a retainer. I was like, Okay. That's fine. And my daughter had also talked to him on the phone, and I assumed that he was going to continue to represent me.
>
> I mean, I never once heard him say, Nope, I'm done. I'm never representing you. I'm out of this case completely. Nothing. Not in an email, not in a text, not verbal, not in front of him, nothing.

(Tr. Vol. I at 9-10.) The trial court contacted prior counsel by Zoom, and he testified:

We did talk a day -- maybe the day before I filed that paperwork [to withdraw], and I indicated to her that I needed to file the paperwork so that I could get off the case.

If, at some point, I said if she got caught up and paid a retainer that I would get back on the case. However, I told her that that would have to be done by the end of March, so that I would have sufficient time to get back on the case and to finish discovery so that I could be prepared for trial.

*She did not make any payments until the middle of -- middle of April, and it was only to get me caught up.*

. . .

*The next day, we asked for that retainer.* I didn't hear anything from Penny except the -- except last Friday, not three days ago, but maybe ten days ago, saying that she expected me to be representing her, despite the fact that we hadn't talked in three months.

So I did not believe that I had been properly retained to be on that trial. It was not per our agreement, and therefore, I did not prepare to come to trial for today or tomorrow.

(Emphasis added.) *Id.* at 13-14. The trial court was apparently incensed by this situation:

THE COURT: All right. So I want to know what planet you live on that you think you can not talk to somebody for months, you're delinquent in payments and you don't pay him until right before the trial and you don't pay a retainer. Did you think they were going to miraculously show up and represent you?

MS. EVANS: No, Your Honor. But I did talk -- my daughter has been talking to him as well.

THE COURT: It's not your daughter's responsibility.

MS. EVANS: Well, it's her responsibility to help me out paying the attorney.

THE COURT: No, it's not.

MS. EVANS: So that's what --

THE COURT: Not in this Court's eyes. You are supposed to be prepared.

MS. EVANS: Let me rephrase. It's not her responsibility nor her obligation. She is giving me the money so I can go forward with this.

THE COURT: And so today, why are you here without representation? You knew [former counsel] was not going to represent you.

MS. EVANS: No, I was under the assumption, and I shouldn't assume anything in life, that he would.

THE COURT: And I want to know why. Would you go to work if somebody didn't pay you and continued not to pay you?

MS. EVANS: No.

THE COURT: All right. All right. So, [former counsel], thank you.

[FORMER COUNSEL]: Thank you, Your Honor.

THE COURT: And I understand we all go through life and things happen, but out of respect for your husband and this Court and opposing counsel and [former counsel], you could have done a courtesy and just contacted everybody to let us know your circumstances, and we would have tried to accommodate you.

MS. EVANS: Yeah. [Richard's] attorney . . . was aware.

THE COURT: But the Court is still -- you owe it to us, because now we have two days [scheduled for trial] and you're not represented, and you're saying you want representation, and this case is delinquent.

You don't have any small children, and you've been the bone of contention this whole trial. Everything has been one-sided where he's cooperated and you have failed to cooperate, and I'm having a problem now you're here, and you're not ready to go to trial.

MS. EVANS: Your Honor, I don't feel that I've not cooperated. Everything that [former counsel] asked me for, I have given him.

THE COURT: All right. You may be seated.

*Id.* at 14-16.  Based on the foregoing, the trial court denied Penny's request for continuance.

{¶ 6} The case then proceeded to trial, and the court received testimony from four witnesses: Richard, Penny, Richard's employer Gary Paine, and Penny's friend Tim Moore. At the close of evidence, one of Penny's four exhibits (an unsworn letter from a nonwitness/nonparty stating that Penny's son no longer lived with her) was excluded by the trial court; her remaining exhibits (bank statements and a list of personal items) were admitted. All of Richard's proffered exhibits (mainly financial and court documents) were admitted. The trial court then ordered the parties to submit written closing arguments, and both Richard and Penny filed such documents in mid-June 2023. Richard moved to strike portions of Penny's argument, but that motion was denied by the trial court after a hearing on August 9, 2023. The trial court issued a judgment entry/decree of divorce the following day.

{¶ 7} In the decree, the trial court adopted a de facto date of termination of the marriage of April 15, 2022, the date that Richard moved out of the marital residence. It valued the marital residence at $255,000, which was the value assigned by a March 9, 2022 appraisal that had been admitted at trial without objection. The mortgage on the residence as of May 3, 2023 was deemed to be $184,168.80; the court found that the residence had an equity value of $70,831.20 and that this equity was a marital asset. The parties were each awarded their own vehicles and ordered to hold each other harmless on any amounts due on those vehicles. The trial court also found that the parties purchased a "camper vehicle" during their marriage, that Richard wished to keep that vehicle, and that Penny had indicated that Richard could keep that vehicle. The court divided household goods of uncertain value, and the court found that Richard and Penny had no joint financial accounts but that they each had individual accounts which held to be the separate property of each. It also concluded:

> [Richard] is the sole proprietor of the "RT Evans Enterprises LLC," which is best described as a transport company consisting of all leased commercial trucks. [Richard], and Gary Paine, both testified at length to the purpose and contracts of the business. [Richard] incorporated the business in 2007, prior to the parties' marriage. Furthermore, [Richard] credibly testified that the LLC is "not profit making" and has no substantial assets that could be liquidated. This is [Richard]'s separate property.

> [Penny] has no interest in any current business at the time of contested trial. However, [Penny] did testify that she believes she should be awarded a payout from [Richard]'s aforementioned business interest because "without my (her) support in the marriage it would not have been possible to keep open and keep operating." Specifically, [Penny] requested a one-time payment in the amount of $250,000.00.

(Jgmt. Entry/Decree of Divorce at 9.) The trial court treated the parties' retirement accounts as separate property and held that "[o]ther than the mortgage on the marital residence, no evidence was presented of marital debt by either party." *Id.* The court further concluded that Richard's average annual net income for the three previous years was $59,326.27 and that Penny's average annual net income for those years was $37,229.51. The court found that Penny testified at trial that she was unemployed but that she "failed to provide sufficient testimony as to why she is currently unemployed." *Id.* at 10.

{¶ 8} The trial court awarded the marital residence to Richard and ordered him to pay Penny $35,415.60 as one-half the equity value of the home. It awarded household goods as requested, awarded the parties their individual vehicles, awarded the camper vehicle to Richard, and ordered that Richard retain his ownership interest in RT Evans. The court awarded no spousal support and awarded no attorney fees or costs.

{¶ 9} This appeal followed, and Penny asserts nine assignments of error with the trial court's judgment.

> **First Assignment of Error:** The trial court erred and abused its discretion in denying the defendant's request for a continuance to obtain counsel.
>
> **Second Assignment of Error:** The trial court erred and abused its discretion in having ex parte communications with appellant's prior counsel after said counsel was granted leave to withdraw to the prejudice of appellant.
>
> **Third Assignment of Error:** The trial court erred and abused its discretion in determining a de facto termination date of marriage without any justification or analysis contrary to R.C. 3105.171(A)(2)(b).
>
> **Fourth Assignment of Error:** The trial court erred and abused its discretion in utilizing present day values on the mortgage but using a random valuation date for the marital

residence without justification when such is contrary to the ordered termination date of marriage.

**Fifth Assignment of Error:** The trial court erred and abused its discretion by failing to value the marital property and failing to order the marital residence sold.

**Sixth Assignment of Error:** The trial court erred and abused its discretion in determining that RT Evans Enterprises LLC was separate property with no value against the manifest weight of the evidence.

**Seventh Assignment of Error:** The trial court erred and abused its discretion by failing to make any required findings of fact and conclusions of law regarding the equitability of the property division pursuant to R.C. 3105.171(G) or make findings that the factors in R.C. 3105.171(F) were considered.

**Eighth Assignment of Error:** The trial court erred and abused its discretion in determining that plaintiff-appellee's income was only $59,326.27 without considering the amount of depreciation and personal expenses being paid by RT Evans Enterprises LLC.

**Ninth Assignment of Error:** The trial court erred and abused its discretion in failing to award spousal support for the benefit of defendant-appellant.

All these assignments of error are reviewed for an abuse of discretion. *See generally Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983) (domestic relations matters reviewed for abuse of discretion).

{¶ 10} In her first assignment of error, Penny asserts the trial court erred by denying her a continuance of the final hearing for her to obtain counsel. But as this court recently observed, the "trial court has broad discretion when ruling on a motion for continuance, and an appellate court reviews the trial court's determination of a motion to continue a trial date for abuse of discretion." *Wilkes v. Wilkes*, 2025-Ohio-1031, ¶ 8-10 (10th Dist.) (affirming trial court's decision to deny continuance of final divorce hearing). We also observed that "Franklin C.P. Div.Dom.Rel. Loc.R. 4(H) provides that '[a]ll motions for continuance . . . must be on a form promulgated by the court,' " and reiterated our prior holding that the court "does not abuse its discretion in failing to grant a continuance when

the local rules require motions for continuance to be in writing and no written continuance is filed." *Id.* at ¶ 10, quoting *Thompson v. Thompson*, 2015-Ohio-4103, ¶ 10 (7th Dist.).

{¶ 11} When denying Penny's request for continuance, the trial court relied upon the analysis set forth in *State v. Unger*, 67 Ohio St.2d 65 (1981), and the court considered each of the *Unger* factors in reaching its decision:

> And in deciding whether to grant a continuance, the Court has a discretion to weigh when it's good cause. And the factors are, in the balancing test, one, the length of the delay requested.
>
> Ms. Evans has not given any indication of being able to obtain counsel in the near future, nor has she made any effort to obtain counsel despite the fact that [former counsel] withdrew from her case February 16th, 2023. This case was filed on October 26th, 2021, a divorce with no minor children. So this is the favor of husband.
>
> Two. Whether continuances have been requested and granted. That one, at one point, it bothered me, but although there have been no continuances with regards to the trial, Ms. Evans had over three months to obtain counsel, or at least consult with one or contact this Court and let the Court know in enough time and manner to address this issue and maybe resolve it for her.
>
> Three. Inconveniences the parties, witnesses, opposing counsel, and the Court. Opposing counsel has said they are ready. They have spent a lengthy amount of time preparing for this trial. Husband wants to get this case done and over with.
>
> Opposing counsel stated that wife had attended a two-day deposition under oath and without counsel and appeared able to comprehend and participate.
>
> Four. Whether there is enough evidence to substantiate a good cause or legitimate cause for Ms. Evans not preparing today and not having counsel and weighing whether to give her time to obtain one.
>
> I gave her an opportunity to discuss. And to me, her biggest complaint is that she expects to live in the house indefinitely, and husband is supposed to pay it and take care of her indefinitely. So there is no good cause regarding that.
>
> Five. Whether the defendant gave rise to the delay, and again, counsel gave you more than enough opportunity to either pay a retainer or obtain new counsel. And again, I have to restate

and reiterate over and over again, we're all adults, and we're all old enough to know that you just cannot bury your head in the sand and not contact anyone for over three months and then to expect to come here and the Court do nothing.

You didn't make a request for a continuance, but basically, that's what I read it to mean, because you're not represented by counsel.

And other relevant factors, again, this Court's docket is voluminous, to say the least. I've got over 1,500 cases, 1,500 or 15,000? 1,500 cases, felt like 15,000. And we wouldn't be able to come back to trial until Kelli, when? September, October? That's our next court date, or we're into December.

THE BAILIFF: November.

THE COURT: November. So if I continued this case, it would be November, December, and I think that would be a miscarriage of justice because there are no children and no need for child support, and for someone to reside in a home or incapacitate a child, I believe in the interest of justice, that we need to proceed today.

(Tr. Vol. I at 22-25.) *See Wilkes* at ¶ 8 (citing *Unger* and "identifying the factors an appellate court considers to determine whether a trial court abused its discretion in denying a motion for continuance").

{¶ 12} The trial court found: 1) that the case had been pending for nearly two years; 2) that despite the fact her counsel had withdrawn some three months earlier Penny was unable to say when or whether she would be able to obtain new counsel; 3) that Penny had failed for three months to inform the court of her situation and any efforts she had made to obtain counsel; 4) that Richard's counsel opposed the continuance and was prepared and ready to proceed to trial; 5) that Penny was unable to establish good cause for further delay; 6) that the delay was attributable to Penny's own inaction; and 7) that the court's docket was so crowded that the next available trial date would be at least six months later.

{¶ 13} Penny argues that she paid her past due balance to her former counsel in the mistaken belief that counsel would reenter the case and represent her at trial, and that had she been aware her former counsel would not be representing her, she would have used the money to obtain new counsel. Given that Penny's payment was for services previously rendered and simply brought her account with former counsel current, the trial court

viewed this claim with some deserved skepticism—the court relied on Penny's own admission that the day after she brought her account current in April, that she "got a message from his secretary that they needed a retainer." (Tr. Vol. I at 10.) But Penny never posted a retainer, and the trial court observed that Penny had attempted to shift blame onto her daughter for the lack of a retainer payment.

{¶ 14} Penny admitted that she had been properly notified that former counsel had withdrawn from her case in February. *Id.* at 9-10. Accordingly, although Penny paid a debt she owed, the trial court found it unreasonable for her to believe that the fact she had done so obligated her former counsel to represent her without posting an additional retainer.

{¶ 15} As a reviewing court we have empathy for all litigants who navigate the legal system, who are required to retain counsel (often at great expense), and who are required to take actions they may wish to refrain from to protect their legal interests. And if we were examining this case de novo it is possible that we would reach a different conclusion and find that a continuance of the trial was warranted on these facts. But that is not our role, and whether this court agrees with the trial court's analysis of the *Unger* factors, that analysis does not constitute an abuse of the trial court's discretion. Based on all the foregoing, the trial court acted within its discretion when it denied the continuance, and Penny's first assignment of error is accordingly overruled.

{¶ 16} In her second assignment of error, Penny argues that the trial court abused its discretion by engaging in an ex parte communication with her former counsel. Prior to requiring her former counsel to appear by Zoom and testify in regard to Penny's motion for continuance of the trial, the trial court indicated it had already spoken with former counsel regarding his withdrawal and his decision not to appear in court for trial:

> THE COURT: All right. So I think we need to have him on Zoom, *because he's telling me a whole totally different story. He said he did an amendment, told you time and time again that he was no longer representing you and would not represent you; that you paid him in full after a long, lengthy time, but that you owe him a trial deposit and retainer for him to attend trial, and you did not do that.*
>
> So I am inclined to believe him, but since he's here and available by Zoom, we'll let him speak for himself, because I don't want two different stories, because I need to make my determination.

(Emphasis added.) *Id.* at 7. Penny argues that the trail court's contact and ex parte discussion with former counsel is a forbidden "independent investigation" into the case. *See, e.g.*, *J.S. v. L.S.*, 2020-Ohio-1135, ¶ 23 (10th Dist.), citing *State v. Bayliff*, 2010-Ohio-3944, ¶ 27 (3d. Dist.) (holding that "[t]here is no authority for a trial court's independent investigation"). But we disagree with this characterization—the trial court did not conduct an independent investigation or rely on facts outside the record to reach its conclusion to deny the continuance. Instead, it contacted former counsel, who spoke in open court as to the questions raised. Courts are generally permitted to engage in limited discussions on collateral issues outside the record, and to prevail on this due process claim, Penny is required to demonstrate both that an ex parte communication occurred and that she was prejudiced because of that communication. *See, e.g.*, *State v. Sanders*, 2010-Ohio-3433, ¶ 21-22 (10th Dist.) (citing cases). And Penny suffered no prejudice because of the communication, since the court properly required former counsel to appear on the record by Zoom and address those questions prior to reaching its conclusion that the continuance was unwarranted. There is nothing in the record to suggest that the court had already determined the issue prior to former counsel's statements on the record—in fact, the court specifically stated that it would "let him speak for himself, because I don't want two different stories, because I need to make my determination." (Tr. Vol. I at 7.) Accordingly, Penny's second assignment of error lacks merit and is overruled.

{¶ 17} Penny's third assignment of error challenges the trial court's decision to assign a de facto date of marriage termination of April 15, 2022. Pursuant to R.C. 3105.171(A)(2):

> "During the marriage" means whichever of the following is applicable:
>
> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;
>
> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital

property, "during the marriage" means the period of time between those dates selected and specified by the court.

Here, neither the entry nor the record contain any specific finding that the date of the final hearing would be inequitable. But in *Kramer v. Kramer*, 2019-Ohio-4865, ¶ 8-10 (10th Dist.), this court affirmed the trial court's decision choice of a de facto date and observed that, "trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, and continually maintain separate residences, separate business activities, and separate bank accounts." *Id*. at ¶ 16, citing *Mantle v. Sterry*, 2003-Ohio-6508, ¶ 13 (10th Dist.). A cursory reading of both the record and the trial court's decree demonstrates that all those facts were present in this case as of April 15, 2022. The evidence clearly supports the de facto date chosen by the court, and given that Penny did not object to that date below, we cannot say that the trial court abused its discretion by choosing it as the date the marriage terminated. Penny's third assignment of error is accordingly overruled.

{¶ 18} Penny's fourth assignment of error challenges the use of the March 9, 2022 appraisal as the valuation of the house on the trial court's chosen de facto date of termination, April 15, 2022. Although the court did not specifically so find, it appears that the court concluded that the appraisal amount was the accurate value on the date of the termination, which was only a month later. Penny has not demonstrated or argued that this conclusion was incorrect. Instead, she asserts that there is no evidence at all the value of the home on the de facto termination date and argues that "in certain instances there may be an equitable reason for selecting a different date on which to value different marital assets . . . the court must adequately explain its reasons for doing so." *Mousa v. Saad*, 2019-Ohio-742, ¶ 23 (3d Dist.), quoting *DeWitt v. DeWitt*, 2003-Ohio-851, ¶ 19 (3d Dist.)

{¶ 19} But there is no evidence that the value of the home changed between March and April of 2022—in fact, Richard testified at trial that he believed the March 9, 2022 appraisal's value was "right on." (Tr. Vol. I at 58.) The appraisal itself was admitted without objection. *Id*. at 328. Moreover, the debt-to-equity ratio of the house mortgage could only have decreased during that period and in the time prior to trial, as it is undisputed that many additional mortgage payments were made after both dates. Penny argues that because of the performance of the Columbus real estate market, the value of the home was higher in April 2022, and higher still on the date of the final hearing, but that is mere

speculation that lacks any evidentiary support in the record. Given the record evidence and the lack of any objection below, we cannot say that the trial court abused its discretion in relying on the appraisal to determine the value of the marital residence, and Penny's fourth assignment of error is accordingly overruled.

{¶ 20} Penny's fifth assignment of error argues that the trial court abused its discretion by failing to order that the marital residence be sold. Her argument under this assignment of error begins from the premise that there is no evidence at all as to the value of the residence on the April 15, 2022 de facto date of termination, because the only evidence of value is the March 9, 2022 appraisal. But we implicitly rejected this premise by overruling Penny's fourth assignment of error. And insofar as Penny claims there is no other evidence of value relating to the remainder of the marital estate, this is directly belied by the exhibits in the record evidence and by Penny's failure to object to the admission of those exhibits below. Accordingly, we overrule Penny's fifth assignment of error as well.

{¶ 21} Penny's sixth assignment of error relates to the valuation of RT Evans and its classification as separate property. The court concluded that RT Evans had no separate value apart from its sole employee and shareholder, Richard. Richard incorporated the business in 2007, but it began serious operations in 2017, when he began working with Paine Holdings and Accurate. The evidence indicates that RT Evans is a "pass-through" entity—it is a middleman that contracts and connects truck drivers with Paine Holdings and Accurate. Richard consistently testified that RT Evans was not a profit-making entity and that he did not draw any salary from the entity.

{¶ 22} Penny argues that the trial court erred in determining that the entity had no value "as the 2021 Tax Return reflects over $264,000 in property utilized for depreciation . . . . [and] over $2 Million in Gross Revenue." (Brief of Appellant at 31, citing Pl's Ex. 9.) But Richard responds that simply relying upon the gross receipts is wildly misleading—the "cost of goods sold" in 2021 according to the tax return was $2,000,846, and therefore there was a gross profit of $187,618 in that year, and that the company's expenses that year totaled at $193,175—meaning that for that year RT Evans operated at a loss of $5,557. Even more importantly for appellate review purposes, we see no basis for adopting Penny's argument that RT Evans must have generated a profit, simply because "who in their right mind is going to run a trucking company if you're not making a profit?" (Tr. Vol. I at 51.)

Her argument is not evidence, and there is simply no evidence to establish her claims here other than her bare assertion that Richard was lying.  *Id.*  In view of this record, the trial court did not abuse its discretion in adopting Richard's position as to the value of RT Evans, and her sixth assignment of error is overruled.

{¶ 23} Putting aside Penny's seventh assignment of error for the moment, in her eighth assignment of error, she argues that the trial court abused its discretion by holding that Richard's income did not include the benefit value of the depreciation of assets and expenses that were paid by RT Evans.  Again, her argument here is rooted in an assumption that is refuted in the evidence; specifically, that RT Evans has a net worth that is separate from Richard personally, and that Richard draws an additional monetary benefit from owning it.  The uncontroverted evidence before the court belies that conclusion, and the trial court did not abuse its discretion by rejecting it.

{¶ 24} Penny's seventh assignment of error argues that the trial court failed to make the required findings of fact and conclusions of law under R.C. 3105.171(G) to support a determination that marital property has been equitably divided.  The statute provides that "[i]n any order for the division or disbursement of property or a distributive award made pursuant to this section, the court *shall make written findings of fact* that support the determination that the marital property has been equitably divided . . . ." (Emphasis added.)

{¶ 25} And on review of the divorce decree, we agree with Penny and sustain this assignment of error.  While the trial court clearly made specific findings regarding spousal support that track R.C. 3105.18(C)(1), it did not make any specific factual findings that track R.C. 3105.171(F) to support its division of marital property.  And although the factors set forth in the two statutes are similar, they are not identical. Compare R.C. 3105.171(F) with R.C. 3105.18(C)(1).  R.C. 3105.171(F) provides:

> In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court *shall consider all of the following factors*:
>
> (1) The duration of the marriage;
>
> (2) The assets and liabilities of the spouses;

(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

**{¶ 26}** Specific consideration of these factors as they relate to division of property is not present in the trial court's decree of divorce. Richard argues that the trial court's findings of fact in the decree were in "in compliance" with the statute, but we cannot agree. The decree does not reference R.C. 3105.171(F) or (G) or make any specific findings consistent with those provisions. In fact, the only reference to R.C. 3105.171 in the decree is in the section analyzing Penny's request for spousal support under R.C. 3105.18. While it is not unreasonable for a reviewing court to conclude that the trial court rejected an award of spousal support under R.C. 3105.18 when the decree contains detailed findings and conclusions under R.C. 3105.171(F) that led it to reject an equitable division, the reverse is not necessarily true. And here, there is no specific conclusion by the court that the division is even equitable, let alone equal.

**{¶ 27}** In *Franklin v. Franklin*, 2012-Ohio-1814 (10th Dist.), this court concluded that a trial court's failure to make the required findings under R.C. 3105.171 prior to making an equitable division of assets was error, even where the party complaining on appeal had not appeared at trial and no particular valuation of the marital assets was available to the

trial court. *Id.* at ¶ 8-12. We specifically cited *Stacey v. Stacey*, 2001 Ohio App. LEXIS 1639 (6th Dist. Apr. 6, 2001) for the proposition that "even if the party adversely affected by the lack of factual findings fails to object and to request findings of fact in the trial court, an appellate court must reverse and remand a case with inadequate factual findings so that the trial court can make the necessary findings." *Franklin* at ¶ 8 (summarizing *Stacey*). We believe that *Franklin* and *Stacey* provide proper guidance to this court based on the facts here, and therefore we sustain Penny's seventh assignment of error.

{¶ 28} Finally, in Penny's ninth assignment of error, she asserts she should have been awarded spousal support. As we have indicated in discussion of her seventh assignment of error, the trial court's decree contains specific findings of fact and conclusions in accordance with R.C. 3105.18(C)(1). But because we have determined that the trial court abused its discretion by failing to ensure its property division was equitable in accordance with R.C. 3105.171, we believe the trial court must also revisit its analysis of spousal support on remand, as it may be affected by a redistribution of property. Accordingly, because we have sustained Penny's seventh assignment of error, we sustain this assignment of error as well.

{¶ 29} In sum, we overrule Penny's first, second, third, fourth, fifth, six, and eighth assignments of error. Penny's seventh and ninth assignments of error are sustained, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is reversed, and the case is remanded for further proceedings consistent with this decision.

*Judgment reversed and remanded.*

MENTEL and BOGGS, JJ., concur.