[Cite as *Sajja v. Atluru*, 2025-Ohio-5740.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Mounika Sajja, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 24AP-614 |
| v. | : | (C.P.C. No. 21DR-4217) |
| Leela Naga Chakradhar Atluru, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 23, 2025

**On brief:** *Trolinger Law Offices LLC* and *Christopher L. Trolinger*, for appellant. **Argued:** *Christopher L. Trolinger*.

**On brief:** *The Law Office of Lisa K. Meier, L.L.C.*, and *Lisa K. Meier*, for appellee. **Argued:** *Lisa K. Meier*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BOGGS, J.

{¶ 1} Plaintiff-appellant, Mounika Sajja, appeals a decision and judgment entry/decree of divorce and shared parenting decree issued by the Franklin County Court of Common Pleas, Division of Domestic Relations. Also before the court are a motion for attorney fees, filed by defendant-appellee, Leela Naga Chakradhar Atluru, and a motion filed by Sajja to strike portions of Atluru's appellate brief. For the following reasons, we deny the motion for attorney fees, deny the motion to strike, and affirm in part and reverse in part the trial court's judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2}    Sajja and Atluru, were married on October 11, 2019, in Columbus, Ohio.  At the time, Sajja held an F-1 visa, and Atluru held a H-1(B) visa.[1]  The parties have one minor child, A.A., born March 4, 2020.  Rather than engage in an exhaustive recitation of the facts here, we will address the relevant facts in our analysis of the assignments of error below.

{¶ 3}    Two years after the parties' marriage, Sajja filed a complaint for divorce and motion for temporary orders in the Franklin County Court of Common Pleas, Division of Domestic Relations, on October 2, 2021.  Atluru filed an answer and counterclaim for divorce on January 10, 2022 and a motion and amended motion for temporary orders on January 10 and 11, 2022.

{¶ 4}    The trial court issued a standard mutual temporary restraining order on December 7, 2021.  As relevant here, the restraining order prohibited either party "[f]rom permanently removing [A.A.] from the jurisdiction of [the trial court], or concealing the whereabouts of [A.A.] during the pendency of this action."  (Dec. 7, 2021 Std. Mut. Temporary Restraining Order at 3.)

{¶ 5}    A magistrate entered temporary orders pursuant to Civ.R. 75 on June 29, 2022.  The temporary orders designated both parties residential parents and legal custodians of A.A., with Atluru having overnight parenting time on Tuesdays, Thursdays, and Saturdays.  The magistrate did not order either parent to pay child support.  An amended temporary order, filed March 14, 2023, again designated both parties residential parents and legal custodians of A.A., but it imposed an alternating bi-weekly parenting schedule.  As before, neither party was ordered to pay child support.

{¶ 6}    By agreed entry filed August 7, 2023, the parties agreed to October 5, 2021 as the de facto termination date of the marriage.  The duration of the marriage for purposes of this action is therefore October 11, 2019 through October 5, 2021.

{¶ 7}    From December 2023 through April 2024, Atluru filed a motion and two amended motions to find Sajja in contempt of court.  In the first motion, filed December 7, 2023, Atluru alleged that Sajja had denied him parenting time in violation of the March 14, 2023 amended temporary order on November 7, 2023 and again beginning December 4, 2023.  Atluru also argued that Sajja violated the amended temporary order by moving to

---

[1] Sajja obtained an H-1(B) visa sometime after August 2020.

Indianapolis, Indiana, in November 2023 without filing a notice of relocation and by enrolling A.A. in daycare in Indiana without consulting Atluru. He further alleged that Sajja's relocation out of state with A.A. also violated the December 7, 2021 restraining order. Finally, he argued that Sajja had violated a case management order by not responding to his discovery requests by the time designated by the trial court. In an amended motion for contempt, filed January 29, 2024, Atluru added allegations that Sajja violated the amended temporary order by claiming A.A. as a dependent on her 2022 taxes and violated an agreed discovery order executed on January 12, 2024 by failing to pay $1500 in attorney fees to Atluru's counsel by January 19, 2024. A second amended motion for contempt filed April 1, 2024, contained the same allegations.

{¶ 8} In addition to requesting attorney fees as relief for Sajja's alleged contempt, Atluru also filed an independent motion for attorney fees pursuant to R.C. 3105.73(A) on January 29, 2024, arguing that, by her conduct throughout these proceedings, Sajja recklessly or purposefully increased Atluru's attorney fees.

{¶ 9} This matter came on for trial over the course of seven days in May and June 2024. Both parties were represented by counsel, and both parties testified. Sajja called as additional witnesses her mother, Swapna Jjotha Sajja; a family friend, "Uncle" Venubabu Talasila; and her former supervisor, James Ramsey. Atluru called as witnesses his mother, Srilakshmi Padmaja Atluru; his sister, Jyostna Gummadi; and his neighbor, Karthiteyam Thamgavelli. The guardian ad litem for A.A., Lindsay Hutchinson, also testified.

{¶ 10} After trial, both parties filed proposed shared parenting plans.

{¶ 11} The trial court issued its decision and judgment entry/decree of divorce on September 5, 2024. The judgment entry included a division of marital property and debt, ordered shared parenting of A.A., and designated Atluru the residential parent for school-placement purposes. The trial court adopted Atluru's parenting plan, with several specified modifications. The trial court ordered no child support and no spousal support, and it found insufficient evidence of financial misconduct by either party.

{¶ 12} The trial court granted in part Atluru's second amended motion for contempt and deemed Atluru's prior motions for contempt moot. Specifically, the trial court found that Sajja violated the March 14, 2023 temporary order by removing A.A. from daycare on November 7, 2023, during Atluru's parenting time, by withholding A.A. from Atluru from

December 4, 2023 through December 9, 2023, by claiming A.A. on her 2022 taxes, and by not sending A.A. to the daycare provider Atluru had chosen. The trial court also found that Sajja violated the December 7, 2021 restraining order by moving with A.A. to Indianapolis during the pendency of these proceedings. For her contempt, the trial court sentenced Sajja to three days incarceration in the Franklin County jail, suspended so long as, within 60 days, she paid Atluru $500 for fees incurred because of her contempt and permits Atluru to claim A.A. on his 2024 and 2025 taxes. The trial court denied Atluru's motion for attorney fees.

{¶ 13} The trial court issued a shared parenting decree on October 3, 2024, incorporating the shared parenting plan Atluru submitted to the court the previous day.

{¶ 14} Sajja filed a timely notice of appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Sajja raises six assignments of error for this court's review:

[1.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO MAKE ANY REQUIRED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE EQUITABILITY OF THE PROPERTY DIVISION PURSUANT TO R.C. 3105.171(G) OR MAKE FINDINGS THAT THE FACTORS IN R.C. 3105.171(F) WERE CONSIDERED.

[2.] THE TRIAL COURT ABUSED ITS DISCRETION BY UTILIZING A DE FACTO TERMINATION DATE OF MARRIAGE AND ALSO USING THE PRESENT VALUE OR INCONSISTENT VALUES OF THE PROPERTY AND FAILING TO TAX EFFECT THE DEFERRED COMPENSATION ACCOUNT.

[3.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO FIND FINANCIAL MISCONDUCT BY THE DEFENDANT-APPELLEE.

[4.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN NOT ORDERING THAT THE PLAINTIFF WAS TO BE THE RESIDENTIAL PARENT FOR SCHOOL PLACEMENT PURPOSES.

[5.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING APPELLANT IN CONTEMPT FOR VIOLATING THE STANDARD MUTUAL

RESTRAINING ORDER AS APPELLANT DID NOT PERMANENTLY REMOVE THE MINOR CHILD OF THE PARTIES FROM THE JURISDICTION OF THE COURT.

[6.]   THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN NOT ALLOCATING THE 2010 NISSAN VERSA OR ALFA ROMEO.

## III.  ANALYSIS

### A.  Motions for attorney fees and to strike

{¶ 16}  Before turning to Sajja's assignments of error, we first briefly address the parties' outstanding motions.

{¶ 17}  On February 4, 2025, Atluru filed a motion for attorney fees pursuant to R.C. 3105.73(B).  R.C. 3105.73(B) states:

> In any post-decree motion or proceeding that arises out of an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that motion or proceeding, the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets.

Atluru alleges that, during the pendency of this appeal, Sajja improperly absconded with A.A. to India without his knowledge or consent.  Attached to the motion for attorney fees is a message in which Sajja informed Atluru that she had traveled to India with A.A. in late January 2025 after A.A. returned from Atluru's parenting time, allegedly in poor health. Sajja stated she had sought medical care for A.A. in India and that A.A.'s recovery would take months, during which time she planned to remain in India with her parents.  On March 20, 2025, this court issued a journal entry, stating it would rule on the motion for attorney fees contemporaneously with its ruling on the merits of this appeal.

{¶ 18}  Atluru reiterated his request for attorney fees in the conclusion of his appellate brief, filed April 14, 2025, and he filed several exhibits alongside his appellate brief in support of his request for attorney fees.  The exhibits include an affidavit from Atluru, in which he repeats much of what he stated in his motion for attorney fees, the message from Sajja that he had previously attached to the motion for attorney fees, a text

message from Sajja denying a request from Atluru for a phone call with A.A., stating that A.A. was "in school," records of Atluru's invoiced attorney fees, and a document noting Sajja's departure from the United States on January 26, 2025. (Apr. 15, 2025 Ex. C.) Atluru refers to those exhibits solely in his discussion of his request for attorney fees.

{¶ 19} With her reply brief, Sajja filed a motion to strike portions of Atluru's appellate brief and the exhibits filed with it. She maintains that Atluru's brief improperly contains allegations concerning events that occurred after the trial court issued its final judgment and that this court may not consider the exhibits because they are not part of the record transmitted by the trial court. Although Sajja is correct that Atluru has presented the court with information that is outside the record transmitted to us by the trial court, we nevertheless deny her motion to strike. Atluru relies on the challenged allegations and exhibits only with respect to his request for attorney fees in his motion and in the conclusion of his appellate brief, and we will limit any consideration of that information to the determination of Atluru's motion for attorney fees. We will not consider it in our analysis of Sajja's assignments of error.

{¶ 20} In any case, we find Atluru's request for attorney fees misplaced. R.C. 3105.73(B), the only authority upon which Atluru moves for attorney fees, applies to a post-decree motion or proceeding in the trial court, or an appeal of such motion or proceeding; it does not apply to direct appeals of a divorce decree. Although R.C. 3105.73(A) does authorize a reasonable award of attorney fees in an appeal from a divorce decree if the court finds such an award equitable, Atluru does not request fees under R.C. 3105.73(A). We therefore deny his motion for attorney fees.

## B. First assignment of error

{¶ 21} Sajja's first assignment of error concerns the trial court's division of marital property under R.C. 3105.171(B), which charges the trial court in a contested divorce to make an equitable, if not equal, division of property between the spouses. Sajja argues the trial court abused its discretion by not making statutorily required findings of fact and conclusions of law regarding the equitability of the property division or to make findings of fact with respect to the factors set out in R.C. 3105.171(F).

{¶ 22} We will affirm a trial court's valuation and division of marital property absent an abuse of discretion. *Kowalkowski-Tippett v. Tippett*, 2021-Ohio-4220, ¶ 34 (10th Dist.),

citing *Hood v. Hood*, 2010-Ohio-3618, ¶ 13 (10th Dist.). A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). " 'Conversely, there is no abuse of discretion where there is some competent, credible evidence supporting the trial court's decision.' " *Kowalkowski-Tippett*, quoting *Smoyer v. Smoyer*, 2019-Ohio-3461, ¶ 24 (10th Dist.). When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Id.*, citing *Blakemore* at 219.

{¶ 23} Each spouse is entitled to an equal division of the marital property unless the trial court finds an equal division would be inequitable, in which case the trial court must divide the marital property to produce an equitable result, after considering the relevant statutory factors. R.C. 3105.171(C)(1). Thus, "the starting point for a trial court's analysis is an equal division of marital assets." *Neville v. Neville*, 2003-Ohio-3624, ¶ 5, citing R.C. 3105.171(C), and *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981). In any case, R.C. 3105.171(C)(1) instructs, "In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section."

{¶ 24} "The facts and circumstances of each case dictate what is an equitable division of marital property." *Apps v. Apps*, 2003-Ohio-7154, ¶ 37 (10th Dist.). R.C. 3105.171(F) states:

> (F) In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:
>
> (1) The duration of the marriage;
>
> (2) The assets and liabilities of the spouses;
>
> (3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;
>
> (4) The liquidity of the property to be distributed;
>
> (5) The economic desirability of retaining intact an asset or an interest in an asset;
>
> (6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any retirement benefits of the spouses, excluding the social security benefits of a spouse except as may be relevant for purposes of dividing a public pension;

(10) Any other factor that the court expressly finds to be relevant and equitable.

**{¶ 25}** A trial court must "make written findings of fact that support the determination that the marital property has been equitably divided." R.C. 3105.171(G); *see also Beagle v. Beagle*, 2008-Ohio-764, ¶ 39 (10th Dist.). "R.C. 3105.171(G) codifies the Supreme Court of Ohio's holding that a trial court must indicate the basis for its division of the marital property in sufficient detail to enable a reviewing court to determine whether the award is fair, equitable, and in accordance with the law." *Franklin v. Franklin*, 2012-Ohio-1814, ¶ 4 (10th Dist.), citing *Cole v. Cole*, 1994 Ohio App. LEXIS 3447 (4th Dist. July 29, 1994), citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97 (1988).

**{¶ 26}** A trial court abuses its discretion if it does not clearly indicate in its decision that it considered the factors enumerated in R.C. 3105.171(F) in making a property division. *Id.* at ¶ 4, citing *Casper v. DeFrancisco*, 2002-Ohio-623 (10th Dist.). The decision need not include an "exhaustive itemization . . . of every factor set forth in R.C. 3105.171(F)," but it must clearly indicate that the trial court considered those factors before making the property division. *Beagle* at ¶ 40, citing *Hightower v. Hightower*, 2002-Ohio-5488, ¶ 21 (10th Dist.), citing *Casper*. Even if an appellant fails to object to the lack of factual findings and to request such findings in the trial court, "an appellate court must reverse and remand a case with inadequate factual findings so that the trial court can make the necessary findings." *Franklin* at ¶ 8, citing *Stacey v. Stacey*, 2001 Ohio App. LEXIS 1639 (6th Dist. Apr. 6, 2001).

**{¶ 27}** Sajja contends the trial court failed to make findings of fact supporting its determination that the property division is equitable and specifically failed to articulate that

it considered the factors listed in R.C. 3105.171(F).[2]  We agree.  Although the trial court correctly stated it was required to determine what constitutes marital property and what constitutes separate property under R.C. 3105.171(B) and then to divide the marital property equally or equitably under R.C. 3105.171(D), it did not cite either R.C. 3105.171(F) or (G), nor did it state that it had considered the factors listed in R.C. 3105.171(F) to arrive at an equitable division of property.  In that regard, the trial court abused its discretion.

{¶ 28} Atluru argues, to the contrary, that the trial court complied with all the requirements in R.C. 3105.171 and did not abuse its discretion in dividing the marital property.  Atluru correctly notes that some of the factors in R.C. 3105.171(F) are not applicable here.  For example, the parties did not own a marital home and there had been no division or disbursement of property pursuant to a voluntary separation agreement, so R.C. 3105.171(F)(3) and (F)(8) do not apply.  But Atluru also maintains that we can discern from the trial court's decision that the trial court did, in fact, consider the other, applicable factors in R.C. 3105.171(F) to determine that the division of property was equitable.  The trial court stated the duration of the marriage, using the agreed upon de facto termination date of October 5, 2021.  *See* R.C. 3105.171(F)(1).  The trial court then proceeded to individually address the parties' assets and liabilities.  Nevertheless, we cannot conclude that the trial court complied with R.C. 3105.171(F) and (G), inasmuch as there is no indication that the trial court considered these facts—including the duration of the marriage and the parties' assets and liabilities—in relation to determining whether its overall division of the marital estate was equitable.

{¶ 29} This court recently reversed a trial court's judgment of divorce in *Evans v. Evans*, 2025-Ohio-1470 (10th Dist.), because the divorce decree did not contain "[s]pecific consideration" of the factors in R.C. 3105.171(F), "as they relate to division of property." *Id.* at ¶ 26.  As here, the decree in *Evans* acknowledged the duration of the marriage and listed and valued the parties' major assets, but the decree "[did] not reference R.C. 3105.171(F) or (G) or make any specific findings consistent with those provisions." *Id.*  Consistent with *Evans*, the trial court's determination of the duration of the parties' marriage and its

---

[2] Sajja also states under her first assignment of error that the trial court failed to consistently value the parties' property as of the de-facto termination date and failed to consider the tax effects of dividing Sajja's deferred compensation account.  Those issues, however, are unrelated to whether the trial court made required findings of fact regarding the equitable nature of the property division.  We discuss those issues later, in relation to Sajja's other assignments of error.

identification and valuation of the parties' major assets and liabilities does not demonstrate compliance with R.C. 3105.171(F) or (G). There is no indication in the trial court's decision that the trial court specifically considered the factors in R.C. 3105.171(F) as they relate to the equitable nature of the property division, nor did not the trial court make specific, written findings of fact to support its determination that the property division is equitable. Although the trial court here, unlike the trial court in *Evans*, did state that its "division of property is equitable to both parties," that bare, conclusory statement, does not satisfy the requirements of R.C. 3105.171(G). (Sept. 5, 2024 Decision & Jgmt. Entry/Decree of Divorce at 4.)

{¶ 30} Because the trial court has not made findings consistent with R.C. 3105.171(F) and (G) in sufficient detail to enable this court to review whether its division of martial property is fair, equitable, and in accordance with the law, we must conclude that the trial court abused its discretion. Accordingly, we sustain Sajja's first assignment of error.

### C. Second assignment of error

{¶ 31} Sajja's second assignment of error, like her first, concerns the trial court's division of property, but focuses on the trial court's valuation of certain assets. Specifically, she maintains that the trial court abused its discretion by using inconsistent dates when valuing the parties' assets and by failing to tax effect her deferred compensation account.

{¶ 32} Pursuant to R.C. 3105.171(G), a trial court must specify in a divorce decree the dates it used in determining the duration of the marriage, as the duration of the marriage affects whether property is marital property or separate property and establishes the appropriate dates for property valuation. *Johnson v. McCarthy*, 2019-Ohio-3489, ¶ 10 (10th Dist.), citing *Liming v. Damos*, 2009-Ohio-6490, ¶ 26 (4th Dist.) and *Alexander v. Alexander*, 2009-Ohio-5856, ¶ 35, 37 (10th Dist.).

{¶ 33} Generally, a trial court will value marital property as of the termination of the marriage. *Johnson*, at ¶ 10, citing *Saks v. Riga*, 2014-Ohio-4930, ¶ 16 (8th Dist.). The court may select an alternative valuation date for an asset, provided it specifies the date and explains its rationale. *Id.*, citing *Meeks v. Meeks*, 2006-Ohio-642, ¶ 15 (10th Dist.) "The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations." *Berish v. Berish*, 69

Ohio St.2d 318 (1982). If a divorce decree is silent as to the valuation date, the marriage's end date controls. *Id*. at ¶ 11.

{¶ 34} Sajja first maintains under her second assignment of error that the trial court erred by not valuing all marital property as of the de facto termination date. She specifically identifies as erroneous the trial court's valuation of her 2018 Chevrolet Malibu and her Bank of America account. The trial court did not specify a different valuation date for these assets, nor did it offer any rationale why a valuation date other than the de facto termination date would be warranted.

{¶ 35} The trial court assigned the 2018 Malibu a value of $19,809, based on a Kelly's Blue Book valuation, admitted at trial with no objection, which states it is valid through March 30, 2022. The Kelly's Blue Book valuation was the only evidence of the vehicle's value before the trial court. The trial court deducted from that value an outstanding loan balance of $13,104, as stated in Sajja's affidavit of property and debt, signed October 15, 2021 and filed with the trial court on December 2, 2021. Attached to Sajja's affidavit was a loan statement, which showed an outstanding balance of $13,104.46 as of October 2, 2021, three days before the de facto termination date. Contrary to Sajja's assertion in her appellate brief, the trial court did not state in the divorce decree that it was using the "present value" of the Malibu or the "current balance" of the loan on the marital balance sheet. (Appellant's Brief at 15.) Rather, the trial court reasonably valued the Malibu as of the de facto termination date based on the only evidence available to it—a Kelly's Blue Book value valid through a date six months after the de facto termination date and a loan balance as of just days after the de facto termination date.

{¶ 36} Sajja is also incorrect when she states that the trial court valued her Bank of America account based on its current value, as of trial, rather than based on its value as of the de facto termination date. Although the trial court's decision does state, "Plaintiff *currently* has a bank account with Bank of America with an approximate balance of $21,695" (emphasis added), that balance is derived directly from the evidence of the account's balance as of September 25, 2021, just over a week prior to the de facto termination date. (Sept. 5, 2024 Decision & Jgmt. Entry/Decree of Divorce at 6.) Sajja does not argue, nor did she present evidence, that the account balance on October 5, 2021, the de facto termination date, differed from the account balance on September 25, 2021.

Accordingly, we conclude that the trial court did not abuse its discretion by assigning a value of $21,695 to Sajja's Bank of America account as of the de facto termination date.[3]

{¶ 37} Sajja's remaining argument under her second assignment of error is that, although the trial court valued her deferred compensation account as of the de facto termination date, it erred by treating the account as a cash asset rather than as a tax-deferred asset. Sajja does not dispute that the marital portion of her deferred compensation account as of the de facto termination date was $3,523, but she argues that the trial court erred by failing to consider that funds in the account will be taxable upon withdrawal.

{¶ 38} There have been no tax consequences as a result of the trial court's treatment of the deferred compensation account, as the trial court did not order Sajja to withdraw funds from the account. *See Meeks*, at ¶ 33. " 'Tax consequences of property division . . . are proper considerations for the court, so long as those consequences are not speculative. For example, if the award is such that, in effect it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered.' " *Id.* at ¶ 32, quoting *Day v. Day*, 40 Ohio App.3d 155, 159 (10th Dist. 1988). On the other hand, tax consequences are speculative when they depend upon assumptions of early withdrawal. *See Guidubaldi v. Guidubaldi*, 64 Ohio App.3d 361, 368 (11th Dist. 1990). Here, the trial court did not order liquidation and division of Sajja's deferred compensation account. The trial court did not order Sajja to withdraw funds from that account, nor does the submitted evidence suggest that she would be required to do so to satisfy other court ordered obligations.

{¶ 39} The amount of future tax obligations with respect to Sajja's deferred compensation account is purely speculative. Sajja presented no evidence from which the trial court could calculate a deviation from the value of the deferred compensation account as of the de facto termination date to account for future tax liabilities. *See Bailey v. Bailey*, 1999 Ohio App. LEXIS 927, * 6 (3d Dist. Feb. 19, 1999) ("Before the trial court can consider reducing the amount of [a deferred compensation plan] due to taxes, the parties must

---

[3] We reject Sajja's suggestion in her appellate brief that some portion of the balance in the Bank of America account was comprised of funds she received as settlement for a personal injury claim, which she claims should have been treated as separate property. Sajja received $22,000 in March or April 2021 as settlement of a personal injury claim, but she testified that she deposited those settlement funds into an account with Huntington Bank and that, as of trial, she had not moved that money. There is no evidence that any of the settlement proceeds had been deposited into the Bank of America account.

submit some evidence on the matter[.] [T]he trial court had no way to determine what the reduced values or tax consequences should be."); *Claytor v. Claytor*, 1996 Ohio App. LEXIS 392, * 18 (10th Dist. Feb. 8, 1996) ("The trial court did not abuse its discretion when it did not consider the tax consequences of appellant's deferred compensation withdrawal when appellant did not specifically present evidence on the matter to the court."). We therefore conclude that the trial court did not abuse its discretion by valuing Sajja's deferred compensation account without reference to speculative tax consequences for which she presented no evidence.

{¶ 40} Having rejected each of Sajja's arguments under her second assignment of error, we overrule that assignment of error.

### D. Third assignment of error

{¶ 41} In her third assignment of error, Sajja maintains that the trial court erred by not finding that Atluru engaged in financial misconduct.

{¶ 42} "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(4). " 'Financial misconduct occurs when one spouse engages in some type of knowing wrongdoing, by which the spouse either profits or intentionally interferes with the other spouse's property rights.' " *Lorey v. Lorey*, 2016-Ohio-5949, ¶ 13 (10th Dist.), quoting *Best v. Best*, 2011-Ohio-6668, ¶ 17 (10th Dist.). " 'The burden of proving financial misconduct is on the complaining spouse.' " *Id.*, quoting *Hamad v. Hamad*, 2007-Ohio-2239, ¶ 62 (10th Dist.).

{¶ 43} An appellate court will not reverse a trial court's determination regarding financial misconduct unless it is against the manifest weight of the evidence. *Best*, at ¶ 18. A decision is not against the manifest weight of the evidence where some competent, credible evidence supports the trial court's findings. *Taub v. Taub*, 2009-Ohio-2762, ¶ 15 (10th Dist.), citing *Pearson v. Pearson*, 1997 Ohio App. LEXIS 2223 (10th Dist. May 20, 1997), citing *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). In determining whether a judgment is manifestly against the weight of the evidence, the appellate court must make " 'every reasonable intendment and every reasonable presumption . . . in favor of the

judgment and the finding of facts.' " *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 21 quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984).

{¶ 44} Sajja claims that, prior to the marriage, Atluru told her he had no debts in India and that none of his family was financially dependent on him. Sajja testified that, in accordance with Indian custom, Atluru agreed to pay for the cocktail party and reception held in conjunction with their wedding but that he failed to do so. Sajja claims she paid those obligations, and Atluru promised to pay her back, but he has not done so. She estimated those expenses totaled about $10,000.

{¶ 45} Atluru was unemployed for a significant portion of the parties' short marriage, beginning from the time he moved to Ohio in November 2019. Despite a prior understanding that Atluru was transferring to a Cincinnati office of his former employer, Sajja learned in early December 2019 that Atluru's employment had been terminated. Atluru obtained part-time work in August 2020, but he did not obtain a full-time position in his field as an engineer until April 2021. While Atluru was unemployed, Sajja paid all family expenses, including rent, utilities, and groceries.

{¶ 46} Sajja testified that, while Atluru was unemployed, she gave him $600 per month to make the loan payment on his Alfa Romeo vehicle and $200 a month for his car insurance. She stated she transferred to Atluru funds for "at least nine payments." (Tr. at 62.) According to Sajja, Atluru would tell her he had made his car and insurance payments, as intended. Sajja's final transfers of $600 and $200 to Atluru's Bank of America account occurred in August 2020, around the time Atluru began working part time. Sajja contends that Atluru stated he was going to use the money from his part-time work to make his car payments. Atluru did not use the money from Sajja or from his part-time employment to pay on his car loan and insurance, however.

{¶ 47} Although Sajja transferred a total of $6,201 to Atluru's Bank of America account from January through August of 2020, Atluru's bank records reveal only a single payment to Digital Federal Credit Union, the holder of his car loan, during that timeframe— a $600 payment on July 17, 2020. (Pl.'s Ex. 4 at 13.) Atluru's credit report indicates that payments were also made on his car loan in March and May 2020, but there are no corresponding withdrawals from Atluru's Bank of America account for the March or May payments, and Atluru did not identify any other bank account in his name during this

period. Atluru claimed that Digital Federal Credit Union granted him a one-year deferment on his car loan beginning in February 2020, although he did not present any evidence from Digital Federal Credit Union in support of that claim. When asked why he made a payment to Digital Federal Credit Union in July 2020, despite the alleged deferment, Atluru explained, "It's part of the payment to make it current, like, they want some payments to make the insurance and the interest current." (May 20, 2024 Tr. at 459.) Atluru did not immediately tell Sajja about the alleged deferment, and for several months he continued to accept money from Sajja for his car payments and insurance. The Alfa Romeo was ultimately repossessed.

{¶ 48} While unemployed and while accepting money from Sajja but not applying it to his car loan and insurance as Sajja intended, Atluru routinely sent money to India via Western Union, primarily he claims for payment on a student loan. Atluru testified that his student loan in India often had to be paid in person, so he would transfer funds to friends and family in India to make the required payments. The record, however, contains no bank records for the loan in India. From October 16, 2019 through the end of 2020, Atluru made Western Union transfers totaling $8442.28.[4] Western Union transfers totaling $3,303.72 identify the recipient of the funds as Atluru himself. Atluru testified, "I think [those funds transferred to] the account that's related to the bank account, to the loan account," although there is no documentation to support that belief. *Id.* at 474. Atluru's mother testified at trial that she sold off some land to pay off Atluru's student loan, although there is again no record of any such transaction nor of the date the loan was allegedly paid off.

{¶ 49} Sajja was unaware of Atluru's debt in India at the time of the parties' marriage. Atluru claimed he first told Sajja about his student-loan debt in March or April 2020. Sajja, however, claimed she first learned Atluru was transferring money to India in December 2020, at which time Atluru told her his educational loans in India were "his priority" over his car payments. (Tr. at 71.) Atluru admitted some of the money he transferred to India was not for payment on his student loans, but for family maintenance.

---

[4] Sajja's Exhibit 19 is a partial history of Atluru's Western Union transfers. Debits corresponding to each of the transfers in that exhibit are noted in Sajja's Exhibit 4 and Atluru's Exhibit CCC—Atluru's Bank of America statements. Atluru's Exhibit DDD is a spreadsheet totaling the amounts of the Western Union transfers in Sajja's Exhibit 19. Although Exhibit DDD states that Atluru's Western Union transfers after October 12, 2019 total $9,809.04, the final two entries in the spreadsheet—totaling $1,366.76—are duplicates of other entries. Subtracting the duplicate amounts reduces the total to $8,442.28. Notably, neither Sajja's Exhibit 19 nor Atluru's Exhibit DDD contains any evidence of Western Union transfers by Atluru in 2021.

{¶ 50} From January 2020 through the de facto termination date of October 5, 2021, Atluru received in his Bank of America account Zelle transfers from family and friends, totaling $4,369. Other than a tax-refund check deposited in April 2020, cash deposits totaling $3,130 from October to December 2020, and the transfers from Sajja discussed previously, those Zelle transfers were the only substantial deposits in Atluru's Bank of America account.

{¶ 51} The trial court found that Sajja did not set forth sufficient evidence to justify a finding that Atluru engaged in financial misconduct. The trial court credited Atluru's testimony that Sajja continued to provide him funds even after she learned that he was sending money to India. It also noted Atluru's testimony that he did not purposefully dissipate assets or amass debt to harm Sajja.

{¶ 52} An appellate court will not reverse the judgment in a civil case as being against the manifest weight of the evidence when some competent, credible evidence supports all the essential elements of the case. *Zibaie v. Zibaie*, 2024-Ohio-1140, ¶ 35 (10th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. In determining whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by the presumption that the trial court's findings are correct. *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, at 80. " 'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal, Co. Inc.* at 80.

{¶ 53} Based on the evidence presented at trial, a trier of fact may have reached different conclusions regarding Atluru's financial activities and about his credibility with respect thereto. The evidence of Atluru's financial activities is undeniably opaque, and witness testimony did not clarify the comings and goings of significant funds into and out of Atluru's Bank of America account. There remain questions regarding the credibility of Atluru's testimony of a loan deferment and his motives in keeping from Sajja that he was not using the money she provided him for its intended purpose of paying his car loan and insurance. Nevertheless, we will not second-guess the trial court's credibility determinations. *See id.* at ¶ 36. As the trier of fact, the trial court believed Atluru's

testimony that he did not purposefully diminish marital assets. The trial court's determination that Sajja failed to prove that Atluru purposefully diminished marital assets is not such that we may conclude the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *See Eastley* at ¶ 20. We therefore overrule Sajja's third assignment of error.

### E. Fourth assignment of error

{¶ 54} In her fourth assignment of error, Sajja argues that the trial court abused its discretion by ordering that Atluru be the residential parent of A.A. for school placement purposes. We review a trial court's finding of legal custody and residential parent for abuse of discretion. *Asbanyoli v. Haddadin*, 2024-Ohio-170, ¶ 11 (10th Dist.).

{¶ 55} R.C. 3109.04(A) requires a court in a divorce case to allocate parental rights and responsibilities for the care of the minor children of the marriage. In doing so, the court must consider what would be in the best interest of the children. R.C. 3109.04(B). The General Assembly has set out in R.C. 3109.04(F)(1) a non-exhaustive list of factors a trial court must consider in determining the best interest of the children for purposes of allocating parental rights and responsibilities, and R.C. 3109.04(F)(2) sets out additional factors for the court to consider in determining whether shared parenting is in the best interest of the children. A trial court must follow R.C. 3109.04 when deciding child-custody matters, but it has broad discretion to determine the appropriate allocation of parental rights and responsibilities. *Pallone v. Pallone*, 2017-Ohio-9324, ¶ 36 (10th Dist.), citing *Parker v. Parker*, 2006-Ohio-4110, ¶ 23 (10th Dist.).

{¶ 56} The trial court expressly considered each factor listed in R.C. 3109.04(F)(1)(a) through (j). It noted that both Sajja and Atluru had requested to be designated residential parent and sole legal custodian, but that Atluru had alternatively requested that the trial court order shared parenting and designate Atluru as the school placement parent. *See* R.C. 3109.04(F)(1)(a). The court found R.C. 3109.04(F)(1)(b) inapplicable, as neither party requested the court to interview A.A. With respect to R.C. 3109.04(F)(1)(c), the trial court noted that A.A. is bonded to and has a close relationship with both parents and, despite contradictory evidence about the primacy of the parents' respective childcare, found that both parents have taken an active role in caring for A.A. The court also found that A.A. has relationships with each parent's family, including those

who live in India. *See id.* The court found that A.A. is well-adjusted to Sajja's home in Indianapolis as well as to Atluru's home in Columbus, having been living for several months on an alternating week-on/week-off schedule between the two, and that she has friends in both communities. *See* R.C. 3109.04(F)(1)(d). The court found that Sajja had enrolled A.A. in Montessori preschool in Indianapolis and that Atluru intended to enroll her in pre-kindergarten at a prep academy, but both parents indicated an intention to move to nearby areas with better school districts when it becomes time for A.A. to begin school. *See id.* Atluru was on a waiting list for an apartment in the Dublin City School District, where he intends that A.A. would attend school.

{¶ 57} With respect to R.C. 3109.04(F)(1)(e), which requires the court to consider the mental and physical health of all involved persons, the trial court considered Sajja's testimony that she had a medical condition, which involved bleeding and anemia that could cause dizziness, but it noted Sajja's testimony that her condition had recently improved. It also acknowledged Sajja's allegations of Atluru's mental-health issues, including an allegation of suicidal ideation, which Atluru denied. Atluru testified that his mental health is currently "pretty good." While not specifically mentioned by the trial court, the guardian ad litem testified that she had not seen anything to raise concerns or contradict Atluru's testimony about his mental health. Ultimately, the trial court found no "significant current mental or physical health concerns affecting either party that would alter the Court's decision regarding parenting rights and responsibilities." (Sept. 5, 2024 Decision & Jgmt. Entry/Decree of Divorce at 12.) With respect to A.A.'s own health, the court found that the evidence revealed medical issues with A.A.—including frequent vomiting—for which she takes medication, but that those issues have not affected A.A.'s ability to thrive and have not resulted in developmental delays.

{¶ 58} Under R.C. 3109.04(F)(1)(f), which requires the trial court to consider which parent is more likely to honor and facilitate court-approved parenting time, visitation, and companion rights, the trial court noted Sajja's history of violating parenting-time orders, as well as her move to Indiana in violation of the standard mutual restraining order without first informing Atluru.[5] It found that Atluru is the parent more likely to honor the court's

---

[5] Sajja moved to Indianapolis in December 2023 after losing her job with the Franklin County Engineer's office, when the Franklin County Engineer's office would not renew her H-1 visa after she did not pass an additional certification test. Having to quickly find new employment with an employer willing to support her

parenting orders. The trial court found R.C. 3109.04(F)(1)(g), which concerns failures to make child-support payments, inapplicable, because neither party was ordered to pay child support during these proceedings. Under R.C. 3109.04(F)(1)(h), the trial court found there had been no abuse of A.A. by either parent. Although it acknowledged Sajja's testimony that she had reported concerns of child abuse by Atluru to Franklin County Children Services, the trial court recognized that the allegations had been found unsubstantiated. Atluru denied all allegations of abuse against A.A. The trial court reiterated under R.C. 3109.04(F)(1)(i) and (j) that Atluru has not withheld A.A. during Sajja's parenting time and that Atluru has been more inclined to compromise on parenting-time schedule changes after Sajja's move out of state.

{¶ 59} The trial court likewise considered each of the factors listed in R.C. 3109.04(F)(2) in determining that shared parenting would be in A.A.'s best interest. The trial court found that, despite hurdles, the parties have generally been able to make joint decisions when it comes to A.A.'s best interest. *See* R.C. 3109.04(F)(2)(a). It stated that both parties encourage A.A. to share love and affection and have meaningful contact with the other parent, and both support A.A. through sometimes difficult parenting exchanges. *See* R.C. 3109.04(F)(2)(b). The court acknowledged Sajja's testimony that Atluru had been physically abusive to her on two occasions, but it found there was not sufficient evidence of an ongoing pattern of abuse that would prevent the parties from engaging in shared parenting. *See* R.C. 3109.04(F)(2)(c). During the parties' marriage, no police reports were filed against Atluru, and Sajja presented no photographs of any injuries she had from the alleged abuse. Despite the distance between the parents' homes in Indianapolis and Columbus, the trial court found that the parents have been successfully meeting for parenting exchanges at a midway point between the residences. *See* R.C. 3109.04(F)(2)(d). Finally, the trial court noted the guardian ad litem's recommendation of shared parenting, with Atluru as the school-placement parent and with the current week-on/week-off schedule continuing until A.A. reaches the age for compulsory schooling. *See* R.C. 3109.04(F)(2)(e).

---

H-1B visa and permanent-residency process, Sajja applied for jobs in central Ohio with no success. Sajja accepted employment from Aecom in Indianapolis in August 2023. Although she originally understood that she would work from home in Columbus four days per week and travel to the office in Indianapolis only one day per week, but she later learned she needed to live closer to the office for immigration purposes.

{¶ 60} Sajja does not argue that the trial court failed to consider any of the factors listed in R.C. 3109.04(F)(1) or (F)(2). She instead essentially maintains that the trial court erred in not assigning more weight to her testimony and erred in its weighing of the statutory factors. Sajja argues she has historically been the more active parent, has been more involved in A.A.'s medical appointments and medical decisions, and has been more motivated and involved regarding A.A.'s education. She faults Atluru, who lived in an apartment complex that is partially in the Columbus City Schools district and partially in the Dublin City Schools district for not knowing which of the two school districts he resided in. Sajja also argues that the trial court erred by considering her move to Indianapolis without also considering that the move was, according to her testimony, necessitated by her employment and immigration situations.

{¶ 61} Assessment of the credibility and the weight of the evidence are reserved for the trial court, and we will not second-guess that assessment. *Lumley v. Lumley*, 2009-Ohio-6992, ¶ 46, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997). The trial court considered all the factors listed in R.C. 3109.04(F)(1) and (F)(2) in conjunction with all the evidence presented during the multi-day trial on this matter, made specific findings of fact, and weighed the evidence to determine that shared parenting with Atluru as the school-placement parent was in A.A.'s best interest. The record supports the trial court's assessment of the evidence, and Sajja has not demonstrated that the trial court's decision is unreasonable, arbitrary, or unconscionable. Accordingly, we overrule Sajja's fourth assignment of error.

### F. Fifth assignment of error

{¶ 62} In her fifth assignment of error, Sajja argues that the trial court abused its discretion by finding her in contempt of court for violating the standard mutual restraining order.[6] We disagree.

{¶ 63} The standard mutual restraining order entered December 7, 2021 enjoined both parties from "permanently removing [A.A.] from the [trial court's] jurisdiction . . . during the pendency of this action." (Dec. 7, 2021 Std. Mut. Restraining Order at 3.) The

---

[6] Sajja does not challenge the trial court's findings that she was in contempt of court based on her violations of the magistrate's March 14, 2023 temporary order by removing A.A. from daycare during Atluru's parenting time, by withholding A.A. during Atluru's parenting time, and by claiming A.A. as a dependent on her 2022 taxes.

trial court found that Sajja violated the standard mutual restraining order by moving with A.A. to Indiana while this case was pending, without first informing Atluru of her move. The trial court also found Sajja failed to provide a valid defense for the violation. For her contempt, the trial court ordered Sajja to serve three days in the county jail, suspended so long as Sajja purged her contempt by paying Atluru $500 within 60 days for fees incurred because of the contempt and by allowing Atluru to claim A.A. on his taxes for tax years 2024 and 2025.

{¶ 64} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554 (2001). "To support a contempt finding, the moving party must establish by clear and convincing evidence that a valid court order exists, the offending party had knowledge of the order, and the offending party violated such order." *In re T.D.A.J.*, 2015-Ohio-4919, ¶ 22 (12th Dist.). The moving party need not prove a "purposeful, willing or intentional violation of a court order [as] a prerequisite to a finding of contempt." *Pugh v. Pugh*, 15 Ohio St.3d 136, 140 (1984). Indeed, " '[i]t is irrelevant that the transgressing party does not intend to violate the court order. If the dictates of the judicial decree are not followed, a contempt citation will result.' " *Id.*, quoting *Pedone v. Pedone*, 11 Ohio App.3d 164 (8th Dist. 1983). We will not reverse a trial court's finding of contempt absent an abuse of discretion. *Boyd v. Boyd*, 2022-Ohio-4775, ¶ 11 (10th Dist.).

{¶ 65} Here, it is undisputed that the standard mutual restraining order was a valid court order. It is also undisputed that Sajja electronically signed and was served with the standard mutual restraining order, although she claims she did not read it completely before signing it. Sajja therefore had knowledge of the order.

{¶ 66} Sajja simply challenges the trial court's factual determination that her move to Indiana violated the terms of the restraining order. She argues she did not permanently remove A.A. from the trial court's jurisdiction, as A.A. continued to go between Sajja's residence in Indiana and Atluru's residence in Ohio, and that it was never her intent to permanently remove A.A. from Franklin County. At trial, however, Sajja acknowledged that she "violated the restraining order by moving -- relocating [A.A.] outside of the state[.]" (May 21, 2024 Tr. Vol. 5 at 564-565.) Based on that acknowledgment, we cannot conclude that the trial court acted unreasonably, arbitrarily, or unconscionably in finding Sajja in

contempt of the standard mutual restraining order based on her move, and removal of A.A., to Indiana. We therefore overrule Sajja's fifth assignment of error.

### G. Sixth assignment of error

{¶ 67} In her sixth assignment of error, Sajja contends that the trial court erred and abused its discretion by not allocating two vehicles—a 2010 Nissan Versa and a 2018 Alfa Romeo—as part of the division of marital property. We disagree and overrule Sajja's sixth assignment of error.

{¶ 68} In the early days of this case, Sajja and Atluru each filed an Affidavit of Property, which required them to identify "all of your property and debts, the property and debts of your spouse, and any joint property or debts." (Capitalization omitted.) (Dec. 2, 2021 Aff. of Property at 1; Jan. 7, 2022 Aff. of Property at 1.) Both Sajja and Atluru identified a 2018 Alfa Romeo Stelvio, titled in Atluru's name. Atluru estimated the value of the Alfa Romeo as $29,500 and disclosed as a secured debt an auto loan on the Alfa Romeo with an outstanding balance of $34,500. Sajja estimated the value of the Alfa Romeo as $30,000, but she did not identify the outstanding loan. In his affidavit, Atluru also identified a 2010 Nissan Versa titled in his name, to which he assigned an estimated value of $2000. Sajja did not identify the Nissan Versa on her property affidavit.

{¶ 69} At the conclusion of trial, the trial court instructed the parties to file final marital balance sheets within two weeks. Atluru submitted a proposed marital balance sheet, which did not include either the Alfa Romeo or the Nissan Versa. Sajja did not file a marital balance sheet. Consistent with Atluru's marital balance sheet, the trial court did not address either the Alfa Romeo or the Nissan Versa as part of the property division; Sajja maintains the trial court's failure to do so constitutes an abuse of discretion. We disagree.

{¶ 70} First, we overrule Sajja's sixth assignment of error with respect to the Nissan Versa, as the evidence plainly demonstrated that the Nissan Versa was not marital property. Marital property includes real and personal property, or an interest in such property, owned by one or both spouses and "*acquired* by either or both of the spouses *during the marriage.*" (Emphasis added.) R.C. 3105.171(A)(3)(a)(i) and (ii). Separate property is excluded from the definition of marital property. R.C. 3105.171(A)(3)(b). The evidence before the trial court established that Atluru did not purchase the Nissan Versa until October 27, 2021, several weeks after the de facto termination date of the marriage.

Property acquired by one spouse after the de facto termination date of the marriage was not acquired during the marriage as required to constitute marital property under R.C. 3105.171(A)(3)(a)(i) and (ii). *See Hemming v. Hemming*, 2002-Ohio-4735, ¶ 19 (10th Dist.); *Hopson v. Hopson*, 2025-Ohio-3257, ¶ 5 (9th Dist.) (When a trial court uses a de facto termination date, the phrase during the marriage means the time between the dates specified by the court), citing R.C. 3015.171(A)(2)(b). Because Atluru did not acquire the Nissan Versa until after the de facto termination date of the marriage, the trial court did not abuse its discretion by not including it in the division of marital property.

{¶ 71} We now turn to Sajja's argument that the trial court erred by failing to include the Alfa Romeo, titled in Atluru's name, in its division of marital property. Atluru testified, and Sajja did not dispute, that Atluru purchased the Alfa Romeo prior to the marriage. Under R.C. 3105.171(A)(6)(1)(a), which includes as separate property "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage," the Alfa Romeo was at least partially separate property. Nevertheless, income and appreciation on separate property due to the labor or monetary or in-kind contributions of either or both spouses during the marriage constitutes marital property. R.C. 3105.171(A)(3). Here, however, there is no evidence that the Alfa Romeo appreciated during the marriage based on Atluru's minimal payments on the car loan, even if those payments were made with marital funds.

{¶ 72} As stated above, both Sajja and Atluru identified the Alfa Romeo on their initial property affidavits, but evidence regarding the Alfa Romeo and its value was scant. The only evidence of the Alfa Romeo's value is Sajja's exhibit 23, a printout of an internet page showing a Kelley's Blue Book fair market value of $16,453 to $18,588, valid through April 4, 2024, for a 2018 Alfa Romeo with 75,000 miles. There is no evidence in the record to establish the value of the Alfa Romeo on or around the October 5, 2021 de facto termination date of the marriage. Evidence of the debt associated with the Alfa Romeo is likewise limited. On February 28, 2022, Digital Federal Credit Union reported the auto loan 180 days past due, with an outstanding balance of $34,423 as of September 2021. Atluru testified that the Alfa Romeo was repossessed, but there is no evidence of when that occurred or of whether or what amount of debt remained following the repossession. There is no evidence of equity gained in the Alfa Romeo or of debt reduced with respect to that

vehicle during the marriage.  Simply put, there is no basis for determining that any portion of the Alfa Romeo constituted marital, as opposed to Atluru's separate, property.  We therefore overrule Sajja's sixth assignment of error with respect to the Alfa Romeo.

## IV.  CONCLUSION

{¶ 73} For the foregoing reasons, we sustain Sajja's first assignment of error, overrule Sajja's remaining assignments of error, affirm in part and reverse in part the trial court's judgment, and remand this matter to the Franklin County Court of Common Pleas, Division of Domestic Relations for further proceedings consistent with this decision and the law.  We deny Atluru's motion for attorney fees and Sajja's motion to strike.

*Motion for attorney fees and motion to strike denied.*
*Judgment affirmed in part and*
*reversed in part*; *cause remanded.*

JAMISON, P.J., and DINGUS, J., concur.

———————————